2004 SD 60

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Jacob L. HESS, Defendant and Appellant.**

**No. 22619.**

Supreme Court of South Dakota.

Considered on Briefs Aug. 25, 2003.

Decided May 5, 2004.

---

316

Lawrence E. Long, Attorney General, Gary Campbell, Assistant Attorney General, Pierre, South Dakota, Attorneys for plaintiff and appellee.

Bryan T. Andersen, Office of the Public Defender, Rapid City, South Dakota, Attorney for defendant and appellant.

KONENKAMP, Justice.

[¶ 1.] In this case, we must decide whether a warrantless police entry and search of a home, mistakenly thought to be the home of an arrestee for whom the officers had a warrant, constituted a Fourth Amendment violation. After looking in the window of a home where the police were to arrest a person on a felony warrant, which was actually the home next door, the officers observed the defendant and another man using a controlled substance. Believing that exigent circum-

stances existed and that this was the home of the person they were to arrest, the officers entered, arrested the men, and searched the premises. The defendant was the boyfriend of one of the women living at this residence. He was not planning on staying overnight on that evening, but he had been an overnight guest on previous occasions. In denying his motion to suppress, the circuit court ruled that the defendant had no standing to contest the search and seizure. The defendant was convicted of possession of a controlled substance. On appeal, we conclude that the defendant had standing to raise a constitutional challenge to the search. However, because the officers acted under the good faith but mistaken belief that they were executing an arrest warrant at the right premises, and because their observations through the window disclosed exigent circumstances allowing an immediate warrantless entry into the home, the Fourth Amendment was not violated by the search and arrest.

## Background

[¶ 2.] On March 6, 2002, at 10:50 p.m., deputies from the Pennington County Sheriff's Office sought to serve an arrest warrant for Thomas Corey. The warrant was for the crime of second degree manslaughter, in that Thomas Corey was charged with recklessly causing the death of a person in a motor vehicle crash on February 10, 2002. The warrant specifically listed Corey's address as "3936 Canyon Lake Dr." Deputy Moore testified that they located Corey's residence by driving along Canyon Lake Drive until they found a mailbox by the road indicating the address of 3936 Canyon Lake Drive.[1] The deputies parked their car on the opposite side of the street behind a wall and proceeded across the four lanes of Canyon Lake Drive. After they passed the mailbox and crossed the lawn, they saw a two-stall carport that adjoined two homes. There were no lights on in the first residence. In the front of the second residence, the officers noticed a vehicle running with its lights on. Deputy Moore shined his flashlight on 3936½, but only saw the number 3936. He testified that later examination revealed that the numbers 3, 9, 3, and 6 were approximately two inches by one inch and the ½ was about a quarter of the size of the other numbers.

[¶ 3.] The deputies also noticed that there were lights on in the second residence. They went to the south side of 3936½ and looked through the window. Deputy Moore knew he was on private property at this point. Although the blinds were pulled, Deputy Moore, by putting his face close to the window, was able to see two males sitting on a bed.[2] To get a better view, he went to a window on the west side of the house located in the carport. Again the blinds were pulled on this window; however, Deputy Moore was able to see that the two males sitting on the bed were loading and smoking a pipe with a white substance taken from a metal container.[3] Believing that he was witnessing the illegal use of a controlled substance,

1. Deputy Moore testified that their typical procedure when serving a felony arrest warrant is to park a distance from the house and walk around the house to see if anyone is inside in order to secure the officers' safety.

2. Testimony revealed that there were two types of window coverings on the windows. The outermost layer consisted of horizontal blinds and the inner layer was a bamboo shade. There is some question on whether both layers were pulled on the window under the carport.

3. Deputy Moore testified that when he looked in the first window he was about one and one-half feet from it; when he looked in the window under the carport he was approximately four feet away.

specifically methamphetamine, Deputy Moore conferred with Deputy Osborne and they decided that there were exigent circumstances because they did not know how much evidence was there. While Deputy Osborne remained at the window to watch the two men, Deputy Moore went to the front door and knocked.

[¶ 4.] Jennifer Mink opened the front door to Deputy Moore. He pushed his way into the house, proceeding to the back bedroom. Deputy Smith followed. Once in the bedroom, the deputies apprehended and restrained the two men, later identified as the defendant Jacob Hess and Tuan Nguyen. Having observed the men from the window, Deputy Osborne indicated that one of them had shoved the metal container underneath the bed. Deputy Moore reached under the bed and pulled out the open metal container. It contained three snort tubes, plastic baggies with a white substance, a couple of vials containing a white substance, razor blades, and a green bag containing a pill. An initial field test showed that the white substance was methamphetamine. Later laboratory tests confirmed the analysis.

[¶ 5.] Upon further investigation, the deputies learned that Jennifer Mink and Jennifer Wright were the persons who lived at the residence. They also discovered that they were not at 3936 Canyon Lake Drive, but at 3936½ Monte Vista. Deputy Sergeant Verchio arrived on the scene after Jennifer Mink requested to speak with a supervisor. He obtained Jennifer Wright's permission to continue to search her bedroom, the room where the defendant had been seen using the methamphetamine. Shortly thereafter, the deputies found a scale and a large white rock substance under the bed.

[¶ 6.] Jennifer Wright later testified that Hess had been at the residence all afternoon, that they had left only to go to dinner, and that they had returned to the residence after dinner. At approximately 10:50 p.m., when the deputies arrived, no definite plans had been made on whether Hess was to spend the night. The group had planned to go out to the bars and it was a possibility that Hess would spend the night in the apartment. Jennifer Wright disclosed that she and Hess had an intimate relationship, that he had been at the residence numerous times before March 6, 2002, and that they had previously spent the night there together.

[¶ 7.] Hess was charged with possession of a controlled substance in violation of SDCL 22–42–5, a class four felony, and inhalation of a substance as defined in SDCL 35–1–1 for the purpose of becoming intoxicated in violation of SDCL 22–42–15, a class one misdemeanor. In circuit court, he moved to suppress the evidence seized, asserting violations of his state and federal constitutional rights. The trial court denied the motion. The court concluded that Hess had no standing to challenge the search because he lacked any reasonable expectation of privacy, since he was not an overnight guest on that occasion. Alternatively, the court found that, even if Hess had a reasonable expectation of privacy, the officers' actions "in approaching the poorly marked residence and peering inside to determine whether Corey Thomas [the arrestee] was present was done in good faith and was objectively reasonable." The court then concluded, "once the officers saw the use of controlled substances, they had exigent circumstances sufficient to enter the residence and secure the situation." Lastly, the court ruled that Wright's consent was sufficient to allow a continued search of her bedroom. After a stipulated court trial, Hess was found guilty of possession of a controlled substance. He was sentenced to a suspended four-year term in the penitentiary and

placed on intensive probation. In addition, he was ordered to serve 180 days in the county jail with work release. The State dismissed the charge of inhaling a substance.

[¶ 8.] On appeal, Hess asserts the following: (1) "The trial court erred in finding that Hess did not have a legitimate expectation of privacy in the home of Wright and Mink to challenge the legality of the deputies' warrantless search and subsequent warrantless entry and search of that home." (2) "The trial court erred in not finding that the deputies' observations through the window of the home of Wright and Mink constituted a search that was in violation of Hess's Fourth Amendment right against unreasonable searches and seizures." (3) "The trial court erred in finding that exigent circumstances did exist justifying the deputies' failure to obtain a warrant before entering and searching the Wright and Mink home." (4) "The trial court erred in finding that the 'good faith' exception to the exclusionary rule applied in the present case." (5) "The trial court erred in finding that the consent given by Wright to search her bedroom was valid."

## Standard of Review

[¶ 9.] "A motion to suppress for an alleged violation of a constitutionally protected right raises a question of law, requiring de novo review." *State v. Herrmann*, 2002 SD 119, ¶ 9, 652 N.W.2d 725, 728 (citations omitted). We review findings of fact under the clearly erroneous standard. *State v. Almond*, 511 N.W.2d 572, 573–74 (S.D.1994). Once the facts have been determined, however, the application of a legal standard to those facts is a question of law reviewed de novo. *State v. Lamont*, 2001 SD 92, ¶ 12, 631 N.W.2d 603, 607 (citation omitted). Whether police had a "lawful basis to conduct a warrantless search is reviewed as a question

of law." *Id.* ¶ 12 (quoting *State v. Sleep*, 1999 SD 19, ¶ 6, 590 N.W.2d 235, 237 (citing *State v. Krebs*, 504 N.W.2d 580, 585 (S.D.1993) (citation omitted))). Thus, the issue whether an exception to the warrant requirement applies is reviewed de novo.

## Analysis and Decision

### Expectation of Privacy

[¶ 10.] Hess asserts that the deputies violated his constitutional protections against unreasonable searches and seizures when they conducted a warrantless search of his girlfriend's apartment and therefore all evidence obtained as a result of the search must be suppressed. Before we consider the validity of the search, we must first determine whether Hess had a right under the Fourth Amendment and similar state constitutional guarantees to challenge the deputies' conduct. The trial court denied the motion to suppress because it found that Hess did not have standing under the Fourth Amendment to challenge the search and because consent to search was later given by one of the persons in lawful possession of the apartment.

[¶ 11.] The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue but upon probable cause[.]" US Const amend IV. Similarly, the South Dakota Constitution, Art. VI, § 11, provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause supported by affidavit, particularly describing the place to be searched and the person or thing to be seized." The Fourth Amendment is a per-

sonal right; thus an individual must invoke its protections. *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 472–73, 142 L.Ed.2d 373 (1998); *State v. Westerfield*, 1997 SD 100, ¶ 9, 567 N.W.2d 863, 866 (citing *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980)); *United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir.1995)). To claim protection under the Fourth Amendment, defendants must demonstrate a personal and reasonable expectation of privacy in the place searched. *Carter*, 525 U.S. at 88, 119 S.Ct. at 472, 142 L.Ed.2d at 387 (citing *Rakas v. Illinois*, 439 U.S. 128, 143–44, 99 S.Ct. 421, and n. 12, 58 L.Ed.2d 387 (1978)); *Westerfield*, 1997 SD 100, ¶ 9, 567 N.W.2d at 866. The threshold question, therefore, is whether Hess had a reasonable expectation of privacy in his girlfriend's apartment.

[¶ 12.] We begin our analysis by reviewing the evolution of United States Supreme Court cases regarding expectation of privacy. In *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), the defendant was arrested in a friend's apartment during the execution of a search warrant and sought to challenge the warrant on the ground that it was not supported by probable cause. Jones testified that:

> the apartment belonged to a friend, Evans, who had given him the use of it, and a key, with which [Jones] had admitted himself on the day of the arrest. On cross-examination [Jones] testified that he had a suit and shirt at the apartment, that his home was elsewhere, that he paid nothing for the use of the apartment, that Evans had let him use it 'as a friend,' that he had slept there 'maybe a night,' and that at the time of the search Evans had been away in Philadelphia for about five days.

*Jones*, 362 U.S. at 259, 80 S.Ct. at 730. Ultimately, the Court ruled that Jones could challenge the search of his friend's apartment because he was "legitimately on premises." *Id.* at 267, 80 S.Ct. 725. "Under these circumstances, this Court stated that while one wrongfully on the premises could not move to suppress evidence obtained as a result of searching them, 'anyone legitimately on premises where a search occurs may challenge its legality.'" *Rakas*, 439 U.S. at 141, 99 S.Ct. at 429 (quoting *Jones*, 362 U.S. at 267, 80 S.Ct. at 734).

[¶ 13.] In *Rakas*, the defendants asserted that they had standing to challenge the search of an automobile in which they were passengers. 439 U.S. at 140, 99 S.Ct. at 429. They argued that "their occupancy of the automobile in question was comparable to that of Jones in the apartment and that they therefore have standing to contest the legality of the search." *Id.* at 141, 99 S.Ct. 421. Finding that the passengers did not have the requisite expectation of privacy to raise a constitutional challenge to the search, the *Rakas* Court rejected the "legitimately on premises" standard set forth in *Jones* as too broad and did away with this rubric of "standing" analysis. However, the Court reaffirmed the factual holding in *Jones*, stating:

> We do not question the conclusion in *Jones* that the defendant in that case suffered a violation of his personal Fourth Amendment rights if the search in question was unlawful.
>
> \*    \*    \*
>
> We think that *Jones* on its facts merely stands for the unremarkable proposition that a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place.

*Id.* at 141–42, 99 S.Ct. 421. Recognizing that Jones, as an overnight guest, was more than merely "legitimately on the premises," the Court ruled that defendants must demonstrate that they personally have an expectation of privacy in the place searched, and that the expectation must be reasonable in order to claim Fourth Amendment protection. *Id.* at 143–44, 99 S.Ct. 421.

[¶ 14.] In *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), the Court held that the defendant, who was an overnight guest in a duplex, had a legitimate expectation of privacy in the premises protected by the Fourth Amendment and could challenge his warrantless arrest. Distinguishing the facts of *Olson* from *Jones,* where the overnight guest was left alone and had a key to the premises with which he could come and go and admit and exclude others, the Court recognized that all citizens share the expectation that hosts will more likely than not respect their guests' privacy interests even if the guests have no legal authority to determine who may enter the household. According to Professor LaFave, *Olson* amounts to a per se rule that one's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable.... Yet, it is fair to say that the *Olson* decision lends considerable support to the claim that shorter-term guests also have standing." Wayne R. LaFave, 5 Search & Seizure § 11.3 (3d ed).

[¶ 15.] In *Carter,* two defendants were present in another person's apartment for a short time for the sole purpose of packaging cocaine. 525 U.S. at 88, 119 S.Ct. 469. Reasoning that the facts of the case fell "somewhere in between" an overnight guest found to have an expectation of privacy protected by the Fourth Amendment

in *Olson,* and a guest merely permitted on the premises who cannot claim the protection of the Fourth Amendment, the Court emphasized "the purely commercial nature of the transaction engaged in here, the relatively short period of time on the premises, and the lack of any previous connection between respondents and the householder." *Id.* at 91, 110 S.Ct. 1684. In doing so, the *Carter* Court concluded that the "situation is closer to that of one simply permitted on the premises," and held that the defendants did not have an expectation of privacy in the premises sufficient to challenge the search. *Id.* Therefore, any search that may have occurred did not violate their Fourth Amendment rights. *Id.* It is important to note that *Carter* was a plurality opinion in which Justice Kennedy provided the fifth vote necessary for a majority, writing in a special concurrence that, "as a general rule, social guests *will* have an expectation of privacy in their host's home." *Id.* at 102, 119 S.Ct. 469 (Kennedy, J., concurring) (emphasis added). Justice Kennedy noted that the defendants in *Carter* were not social guests but had used the apartment merely as a processing station to prepare drugs for sale. Relying on the specific facts presented in *Carter,* Justice Kennedy concluded that the defendants were an exception to the rule that social guests will have an expectation of privacy. He wrote:

> I join the Court's opinion, for its reasoning is consistent with my view that almost all social guests have a legitimate expectation of privacy, and hence protection against unreasonable searches, in their host's home.

*Id.* at 99, 119 S.Ct. 469. In summary, *Minnesota v. Carter* stands for the proposition that "parties who are in a residence for only a few hours, on 'business,' and who have little or no previous relationship with the owner or occupants of the premises do not have standing to contest the

search of the premises (as opposed to their personal belongings)." Whitebread and Slobogin, *Criminal Procedure, An Analysis of Cases and Concepts* 135 (4th ed 2000).

[¶ 16.] Following *Carter*, several decisions have recognized that social guests who fall somewhere between the overnight guest in *Olson* and a guest simply permitted on the premises have a legitimate expectation of privacy and may mount a Fourth Amendment challenge to searches and seizures. *See United States v. Fields*, 113 F.3d 313, 317–21 (2d Cir.1997), *cert. denied*, 522 U.S. 976, 118 S.Ct. 434, 139 L.Ed.2d 334 (1997) (guest who prepared cocaine in the householder's young son's bedroom with her permission; could and did bring guests to the residence, with whom he drank beer and watched television; possessed a key; had used the premises 40 to 50 times; and could come and go even in the householder's absence had a legitimate expectation of privacy, even though he did not spend the night there, citing *Olson* ); *United States v. Gamez–Orduno*, 235 F.3d 453, 459 n. 8 (9th Cir. 2000) (status as overnight guest may not be necessary, quoting 5 Wayne R. LaFave, *Search and Seizure* § 11.3, at 15 (3d ed Supp 2000), which stated that "the several opinions in *Carter* add up to a 'different majority ... [that] actually embraced the position that a social guest would not have to be an overnight guest in order to have standing in the premises of another' "); *United States v. Rhiger*, 315 F.3d 1283 (10th Cir.2003) (defendant was a "social guest" at his host's home, and therefore had standing to object to federal drug agents' search of the house, where he had known the host for about two weeks, had a regular presence at the home, stayed overnight at the house on a few occasions when he was too intoxicated to drive, had receipts in the house for items he had purchased, and was comfortable enough to enter the residence unannounced to take a nap); *Welfare of B.R.K.*, 658 N.W.2d 565 (Minn.2003) (minor, a social guest in host's home for a party, had a reasonable expectation of privacy in host's home to invoke his Fourth Amendment protections to challenge a warrantless search of host's home). Although it could be argued that this Court in *Westerfield* previously determined that an occasional guest has no reasonable expectation of privacy in property owned by another, that 1997 decision predated *Carter*.

■ [¶ 17.] Like the overnight guest in *Olson*, Hess was much closer to the status of an overnight guest than one who was simply permitted on the premises. Deciding whether a person has a legitimate expectation of privacy is made on a case-by-case basis, considering the facts of each particular situation. *State v. Breuer*, 577 N.W.2d 41, 46 (Iowa 1998). Here, the burden was on Hess to show that he had a reasonable expectation of privacy in his girlfriend's apartment. *Carter*, 525 U.S. at 88, 119 S.Ct. 469. At the suppression hearing, testimony revealed that Hess had an intimate relationship with Wright. In addition, while it was uncertain whether Hess would have stayed overnight with Wright on that particular evening, he had previously spent the night on several occasions. Thus, he was not just a visitor or party guest. *See State v. Patterson*, 966 S.W.2d 435, 441 n. 5 (Tx.Crim.App. 1997). On the day of the search, except when they left briefly to eat, Hess had been at the apartment all afternoon watching a movie with Wright. Furthermore, Hess had a back pack in the apartment and apparently felt comfortable enough to take off his shoes. He had the freedom to go into Wright's bedroom and close the door without Wright. By closing the door to Wright's bedroom, Hess exercised control of the room and the ability to exclude

others. On these facts, we conclude that Hess had a reasonable expectation of privacy in his girlfriend's apartment.

## Good Faith

■ [¶ 18.] Having established that Hess had a legitimate expectation of privacy in his girlfriend's apartment, specifically the room in which the evidence was found, we now turn to the merits of his motion to suppress. With respect to the mistaken approach and entry of a wrong address to execute an arrest warrant, we are unaware of any authority directly on point. To resolve this case, therefore, we analyze two species of law enforcement mistakes: arrests of the wrong person with a valid arrest warrant, and searches of the wrong premises with a valid search warrant. In both instances, the Supreme Court has upheld the arrest and search when the officers acted in objective good faith.

[¶ 19.] In *Hill v. California*, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), the police had probable cause to arrest a person named Hill but mistakenly arrested Miller. At the time of the arrest, Miller was at Hill's apartment and fit Hill's description. The Court resolved the questions whether Miller's arrest was valid and whether a search of Hill's apartment upon Miller's arrest was also valid. As to the arrest, the Court wrote:

> Based on our own examination of the record, we find no reason to disturb either the findings of the California courts that the police had probable cause to arrest Hill and that the arresting officers had a reasonable, good-faith belief that the arrestee Miller was in fact Hill, or the conclusion that "[w]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest."

*Id.* at 802, 91 S.Ct. 1106. As for the search, the Court stated that "the police were entitled to do what the law would have allowed them to do if Miller had in fact been Hill[.]" *Id.* at 804, 91 S.Ct. 1106.

■ [¶ 20.] In *Maryland v. Garrison*, 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987), the police reasonably believed both when they applied for and when they executed a search warrant that the building to be searched contained one third floor apartment. But the third floor was actually divided into two apartments. Consequently, the police searched both the apartment the warrant affidavit established probable cause for and the adjoining apartment. Upholding the validity of the conviction based on evidence found in the adjoining apartment, the Court wrote:

> While *Hill* involved an arrest without a warrant, its underlying rationale that an officer's reasonable mis-identification of a person does not invalidate a valid arrest is equally applicable to an officer's reasonable failure to appreciate that a valid warrant describes too broadly the premises to be searched.

*Id.* at 87–88, 107 S.Ct. 1013. Thus, the standard is whether the "officers' conduct was consistent with a reasonable effort to ascertain and identify the place intended to be searched within the meaning of the Fourth Amendment." *Id.* at 88, 107 S.Ct. 1013. *See also Dawkins v. Graham*, 50 F.3d 532, 534 (8th Cir.1995) ("the execution of a valid warrant on the wrong premises violates the Fourth Amendment if the officers should know the premises searched are not the premises described in the warrant, i.e., the officers' mistake is not objectively reasonable").

■ [¶ 21.] To resolve our case, we rely on the combined analyses of *Hill* and *Garrison*. In general, these two cases hold that to sustain the validity of such an arrest or search, the prosecution must

show that the warrant was valid and that the police acted with objective reasonableness. Here, there is no dispute concerning the validity of the warrant for Corey's arrest, and the circuit court was satisfied that the deputies reasonably believed that they were at Corey's home to serve the warrant. A valid arrest warrant implicitly grants to police the limited authority to enter a suspect's residence "when there is reason to believe the suspect is within." *Payton*, 445 U.S. at 603, 100 S.Ct. at 1388. In this case, both adjacent houses had almost the identical address, with the exception that one had the number "½" in smaller size next to the larger house number. The circuit court specifically concluded that even if Hess had an expectation of privacy, the officers' "actions in approaching the poorly marked residence and peering inside to determine whether [Corey] was present was done in good faith and was objectively reasonable." As this finding contains factual and credibility determinations, as well as legal conclusions, we will not reverse the factual rulings unless they were manifestly erroneous. Because the touchstone of search and seizure analysis is reasonableness, we conclude that based on the entirety of circumstances, the officers did not violate the Fourth Amendment by their approach and glance in the window of the home they believed was the home of the intended arrestee.[4] Whether they were entitled to enter the home based on what they saw will be the next step in our analysis.[5]

## Exigent Circumstances

[¶ 22.] We earlier noted that the Fourth Amendment guarantees the right to be free from unreasonable searches and seizures. As the United States Supreme Court explained, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed[.]" *United States v. United States Dist. Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752, 764 (1972). Accordingly, it is well established that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639, 651 (1980). Generally, this means that, with some specifically delineated exceptions, every law enforcement entry into a home for the purpose of search and seizure must be made with a warrant. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *Lamont*, 2001 SD 92, ¶ 50, 631 N.W.2d at 617.

[¶ 23.] The State has the burden of proving that a specific search falls into a delineated and limited exception. *See State v. Heumiller*, 317 N.W.2d 126, 128 (S.D.1982); *State v. Max*, 263 N.W.2d 685, 687 (S.D.1978). Legal analysis is limited to "the facts perceived by the police at the

---

4. The United States Supreme Court in *United States v. Leon*, 468 U.S. 897, 919, 104 S.Ct. 3405, 52 L.Ed.2d 677 (1984), stated that the exclusionary rule should be applied only in those circumstances where it is clear that its application will deter police misconduct. Exclusion of evidence here based on the warrantless search and entry of the wrong residence on the good faith but mistaken belief that it was the proper residence would not deter future police misconduct.

5. For the seizure of evidence to be admissible under the plain view exception to the warrant requirement, (1) the officers must not have "violate[d] the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." *Horton v. California*, 496 U.S. 128, 136, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990). And (2) the discovery of the evidence "must be inadvertent; and its evidentiary value must be immediately apparent to the officer." *State v. Kelly*, 130 Ariz. 375, 636 P.2d 153, 156 (1981) (citations omitted).

time of the entry, not as subsequently uncovered." *Lamont,* 2001 SD 92, ¶ 50, 631 N.W.2d at 617 (citing *State v. Meyer,* 1998 SD 122, ¶ 23, 587 N.W.2d 719, 724 (citing *Heumiller,* 317 N.W.2d at 129)).

[¶ 24.] Exigent circumstances will justify a warrantless entry into a home for the purpose of either arrest or search. *Payton,* 445 U.S. at 590, 100 S.Ct. at 1382. Such circumstances exist when there is an emergency: a situation demanding immediate attention with no time to obtain a warrant. *Heumiller,* 317 N.W.2d at 129 (citations omitted). A common example is hot pursuit. *See Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

[¶ 25.] A gauge for determining whether exigent circumstances existed is to ask whether police officers, under the facts as they knew them at the time, would reasonably have believed that delay in procuring a search warrant would gravely endanger life, risk destruction of evidence, or greatly enhance the likelihood of a suspects escape. *Max,* 263 N.W.2d at 687 (citation omitted); *Meyer,* 1998 SD 122 at ¶ 23–24, 587 N.W.2d at 724. The analysis of whether this exception to the warrant requirement has been made out is an objective one centering on what a reasonable, experienced law enforcement officer would have believed. *United States v. Clement,* 854 F.2d 1116, 1119 (8th Cir.1988). As Justice Jackson wrote, "When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant." *McDonald v. United States,* 335 U.S. 451, 460, 69 S.Ct. 191, 195–96, 93 L.Ed. 153 (1948).

[¶ 26.] Although the parties cite us to no case on point, there are numerous analogous cases dealing with the question whether the odor of burning marijuana provides exigent circumstances for a warrantless entry into a residence. These cases from other jurisdictions hold that because the smell of burning marijuana is itself proof that evidence of criminal conduct is being destroyed, the detection of that smell establishes exigent circumstances. *See State v. Decker,* 119 Ariz. 195, 580 P.2d 333 (1978); *State v. Kosman,* 181 Ariz. 487, 892 P.2d 207 (Ct.App.1995); *Mendez v. People,* 986 P.2d 275 (Colo. 1999); *People v. Baker,* 813 P.2d 331 (Colo. 1991); *Joseph v. State,* 3 S.W.3d 627 (Tex. App.1999); *see also* Donald M. Zupanec, Annotation, *Odor of Narcotics as Providing Cause for a Warrantless Search,* 5 A.L.R.4th 681 (1981). *But see Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948) (smell of burning opium alone cannot create probable cause to effect a warrantless search and arrest).

[¶ 27.] On the other hand, many other courts hold that the smell of burning marijuana does not evince a sufficiently grave offense to justify entering a residence without a warrant. These courts rely on the distinction between minor and serious offenses made by the United States Supreme Court in *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). *See State v. Curl,* 125 Idaho 224, 869 P.2d 224 (1993), *cert. denied,* 510 U.S. 1191, 114 S.Ct. 1293, 127 L.Ed.2d 646 (1994); *Haley v. State,* 696 N.E.2d 98 (Ind. Ct.App.1998); *State v. Beeken,* 7 Neb.App. 438, 585 N.W.2d 865, 872 (1998) (dictum); *State v. Wagoner,* 126 N.M. 9, 966 P.2d 176 (N.M.Ct.App.), *cert. denied,* 125 N.M. 654, 964 P.2d 818 (N.M.1998); *State v. Ackerman,* 499 N.W.2d 882 (N.D.1993); *State v. Robinson,* 103 Ohio App.3d 490, 659 N.E.2d 1292 (1995); *State v. Ramirez,* 49 Wash.App. 814, 746 P.2d 344 (1987).

[¶ 28.]To understand the distinction between serious and minor offenses, we must closely examine the *Welsh* decision, which

is binding on us under the Supremacy Clause of the United States Constitution. In *Welsh,* the Court concluded that the police violated a driver's Fourth Amendment rights by arresting him in his home without a warrant for DUI. The police had claimed that exigent circumstances justified entry into the driver's home to obtain his blood-alcohol level because he had fled the scene of an accident. *Id.* at 742, 104 S.Ct. 2091. As it had on several earlier occasions, the Court emphasized that the "police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Id.* at 749–50, 104 S.Ct. 2091. The opinion noted that only "hot pursuit of a fleeing felon," "destruction of evidence," and "ongoing fire" were recognized by the Court as emergency situations justifying a warrantless search or arrest, and that heretofore only the "hot pursuit" doctrine was applied to arrests in the home. *Id.* at 750, 104 S.Ct. 2091. Furthermore, the Court wrote:

> Our hesitation in finding exigent circumstances, particularly when warrantless arrests in the home are at issue, is especially appropriate when the underlying offense for which there is probable cause to arrest is relatively minor. Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries. *When the government's interest is only to arrest for a minor offense, that presumption of unreasonableness is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate.*

*Id.* at 750, 104 S.Ct. 2091 (citations omitted) (emphasis added). The Court held

that an important factor in determining whether an exigency exists is "the gravity of the underlying offense for which the arrest is being made." *Id.* at 753, 104 S.Ct. 2091.

[¶ 29.] Unlike marijuana offenses, which are ordinarily misdemeanors, possession of methamphetamine is a felony in South Dakota. SDCL 22–42–5. In South Dakota, law enforcement officers may make a warrantless arrest when they have probable cause to believe that the person to be arrested has committed a felony or a class one misdemeanor. SDCL 23A–3–2 (2). The deputies saw Hess and his companion in possession what they believed to be methamphetamine. Unquestionably, possession of a controlled substance, like methamphetamine, is a serious offense. *Cf. Clement,* 854 F.2d at 1119–20 (8th Cir. 1988) (citing *Welsh,* noting the necessity of looking to the gravity of the offense, and characterizing cocaine trafficking as "a serious offense" that justified entry into hotel room). *See Lamont,* 2001 SD 92, 631 N.W.2d 603 (hit and run homicide—officers justified in warrantless entry to motel room where critical evidence of suspect's BAC was dissipating by the minute). Moreover, Hess and his companion were in the process of consuming this evidence. Compare *State v. Hughes,* 233 Wis.2d 280, 607 N.W.2d 621, 628 (2000), where a warrantless entry was upheld because, under the circumstances, the apartment occupants had every incentive to intentionally destroy evidence because they knew the police were present outside. As the court held in *United States v. Haddix,* 239 F.3d 766, 769 (6th Cir.2001), "notwithstanding the ease in which narcotics can be destroyed, a warrantless entry into the home of a suspected drug trafficker, effected without an objectively reasonable basis for concluding that the destruction of evidence is imminent, does not pass constitutional

muster." In this case, however, the destruction of the evidence was taking place at the very moment the deputies were peering through the window. Thus, the warrantless entry here can be justified under the exigent circumstances exception.

[¶ 30.] In summary, we conclude that Hess had standing to challenge the warrantless entry and search of the bedroom where he was seen consuming a controlled substance. Nonetheless, the deputies were rightfully in a position to see this illegal conduct while they held the good faith but mistaken belief that they were about to serve a valid arrest warrant on a person inside the home. Once they observed Hess using methamphetamine, exigent circumstances existed allowing the deputies to enter the home, arrest him, and seize the evidence. Thereafter, one of the permanent residents of the home gave further permission for a continued search of her bedroom.

[¶ 31.] Affirmed.

[¶ 32.] GILBERTSON, Chief Justice, and ZINTER, Justice, concur.

[¶ 33.] SABERS and MEIERHENRY, Justices, concur in part and dissent in part.

SABERS, Justice (concurring in part and dissenting in part).

[¶ 34.] I concur with the majority opinion's determination that Hess had a reasonable expectation of privacy in his girlfriend's apartment. I dissent from the majority opinion's conclusions of good faith and exigent circumstances.

[¶ 35.] The majority opinion characterizes the officers' initial actions as an "approach and glance" in the window of the home. Majority opinion, ¶ 21. This characterization implies that the officers' actions were only minimally intrusive. On the contrary, the officers' "approach and glance" was an unwarranted intrusion, in the middle of the night, by law enforcement officers, into a woman's bedroom. Even Deputy Moore described their activity that evening as more than merely approaching or glancing into the window. He testified that he went onto the property, crossed into the carport, and peered through the closed blinds of a bedroom window to see what was going on inside. The deputy saw two men sitting on a bed, but could not see what they were doing. Unsatisfied with this view, the deputy went to yet another covered window on the back side of the home, and looked inside again. It was at the second window that he allegedly saw the two men smoking methamphetamine. After observing the subjects for a moment, the deputy called another deputy over to have a look in the window. The deputy finally proceeded to the front door and knocked. Before the home's lessee could open the door, the deputy "pushed the door open and Deputy Smith held [the lessee]" while Deputy Moore proceeded to· the bedroom where the subjects were first spied upon.

[¶ 36.] Before this Court reaches the question whether exigent circumstances justified the search, it must be determined whether the officers were lawfully allowed to peer into the covered window in the middle of the night. I agree with the Florida District Court of Appeals' statement in a similar case:

> Regardless of [the officer's] good faith, the implications of sanctioning police surveillance by standing in a yard at one's window in the middle of the night are too obvious to require elaboration.

*Olivera v. Florida*, 315 So.2d 487, 491 (Fla. App. 2 Dist.1975). There is significant reason to doubt that the officers' actions in this case were objectively reasonable.

[¶ 37.] First, it is important to note that the officers had an arrest warrant, not a search warrant. This Court has discussed the different interests protected by arrest and search warrants:

> An *arrest warrant* is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure. A *search warrant*, in contrast is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an individuals interest in the privacy of his home and possessions against the unjustified intrusion of the police.

*State v. Meyer*, 1998 SD 122, 31, 587 N.W.2d 719, 725 (quoting *Steagald v. United States*, 451 U.S. 204, 213, 101 S.Ct. 1642, 1648, 68 L.Ed.2d 38, 46 (1981) (emphasis supplied)). Even assuming the police had been at the right home when they decided to peer into the bedroom, they exceeded the authority granted by the arrest warrant when they went onto the curtilage of the property and looked into two covered windows, one of which was under a carport and the other on the backside of the house.[6] This is so because:

An arrest warrant is not the equivalent of a search warrant with respect to the authority it gives state agents to enter or to search in or around a suspects premises. An arrest warrant authorizes an officers entry into a suspects residence only to the extent necessary to accomplish the purpose of the warrant, which is to effectuate the arrest of the defendant.

*State v. Northover*, 133 Idaho 655, 661, 991 P.2d 380, 386 (1999) (Lansing, Judge, concurring in result)). Even assuming for the moment that the officers had been at the right home, there was no justification for looking into a covered window prior to announcing their presence and the purpose of the call.

[A]n arrest warrant does not automatically give officers *carte blanche* authority to search the grounds around the home or to intrude onto the private curtilage in order to peer into windows where the officers have not first ascertained whether the suspect will respond to a knock on the door and submit to arrest.

*Id.* This is particularly so when there is no indication on the record that there was a possibility that the person for whom they had the arrest warrant was violent, had a history of escape, or possessed evidence of the underlying crime that he would attempt to destroy.[7] More disturbing is the

6. The common law definition of curtilage is: [T]he area to which extends the intimate activity associated with the "sanctity of a man's home and the privacies of life," [] and has therefore been considered part of the home itself for Fourth Amendment purposes. Thus, courts have extended the Fourth Amendment protection to the curtilage; and they have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private.

*State v. Vogel*, 428 N.W.2d 272, 275–76 (S.D.1988) (additional and internal citations and quotations omitted). Certainly, if a police officer draws close enough to a home to peek into two bedroom windows, one can safely assume he has entered the curtilage of the home.

7. The arrest warrant was based on a vehicular homicide occurring weeks before the warrant was issued. The arrestee was accused of reckless driving in that he ran a stop light at a high rate of speed and caused a collision, resulting in a fatality. Both vehicles involved

fact that neither of the subjects in the bedroom fit the description of the person described in the arrest warrant.

[¶ 38.] When an officer intrudes into an area protected by the Fourth Amendment, the State has the burden of proving an exception to the warrant requirement. The State made no effort to come forth with evidence to justify this intrusion other than the fact that the officers held an arrest warrant. An arrest warrant does not make every house on the street fair game to a peeping officer. The arrest warrant for Corey protected Corey's interest in ensuring the police had probable cause to seize his person. That warrant did nothing to protect Hess' interest in insuring that police had probable cause to search the home he was visiting. An arrest warrant is an insufficient device and inadequate under these circumstances to defeat the reasonable expectation of privacy held by Hess and the lessees of the house; that is, their reasonable expectation of privacy in a bedroom, in the middle of the night, behind covered windows.

[¶ 39.] As apparent additional justification for the police intrusion, the majority opinion makes reference to the plain view doctrine. However, the reference to the plain view doctrine does nothing to bolster the determination that the officers' actions were permissible in a constitutional sense. The plain view doctrine presupposes that the officer was in a place where he had a right to be and that he had a lawful right of access to the object in plain view. *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). The majority opinion makes no attempt to establish that the officers had a right to bypass the front door of the home, enter the carport, peek in a covered window, walk around the back of the wrong house and peek into yet another covered window. The plain view doctrine is inapplicable in this case because the officers had no right to be within the curtilage of the home peering into the windows of the wrong house with only an arrest warrant.

[¶ 40.] The State spends considerable time discussing the reasonableness of the officers' activities but fails to justify the failure to ascertain whether they were searching the proper house. Having noticed that the two homes were adjoined by the carport, a reasonable officer would have at least flashed his or her flashlight over the house numbers on the adjoining building to ensure that they were proceeding to the proper address. They did not in this case. The State argues that the officers reasonably believed they were at the proper house because it was dark outside and difficult to see the "1/2" on the end of the house number. Yet it was the officers who chose to execute the arrest warrant at 11:00 at night, chose not to drive by in daylight hours to make certain they had the proper home, and chose to peer into covered bedroom windows rather than simply knocking on the door and announcing their presence. Worse, Deputy Moore testified that he *walked across the front lawn of # 3936* to get to 3936½. He also testified that it was not the actual address of the home that drew his attention, but rather, the fact that there were lights on and a vehicle running in front of # 3936½. It is unfathomable how this can be construed as an objectively reasonable procedure for executing a felony arrest warrant at # 3936.

[¶ 41.] Furthermore, later in the evening, while standing on the front porch, the officers were able to see the "1/2" at the end of the address. This begs the question why they were unable to see the "1/2" when they were standing on the

in the accident were already in police custo-   dy.

porch prior to their forcible entry into the home, or why the deputy standing at the front of the house while the others peeked into the windows did not look at the address and notice the "1/2" sign. Any of these reasonable steps would have prevented this so-called "good faith" mistake.

[¶ 42.] Logic dictates that if there were reasonable steps the officers should have taken to prevent the unwarranted intrusion into the home of a presumptively innocent person, and the officers failed to take those steps, then the search was not objectively reasonable, and the good faith exception to the warrant requirement does not apply.

[¶ 43.] I also dissent from that portion of the majority opinion holding that exigent circumstances justified warrantless forcible nighttime entry into the home. The majority opinion relies on the fact that evidence was being destroyed because the defendant was ingesting the methamphetamine. Defendant was charged with possession of a controlled substance in violation of SDCL 22–42–5, and inhalation of a substance for the purpose of becoming intoxicated in violation of 22–42–15.

[¶ 44.] SDCL 22–42–5 provides in part: No person may knowingly possess a controlled drug or substance unless the substance was obtained directly or pursuant to a valid prescription or order from a practitioner[]. A violation of this section is a Class 4 felony.

SDCL 22–42–15 provides in part:
Any person who intentionally ingests, inhales, or otherwise takes into the body any substance [] for purposes of becoming intoxicated, unless such substance is prescribed by a practitioner of the medical arts [], is guilty of a Class 1 misdemeanor. The venue for a violation of this section exists in either the jurisdiction in which the substance was ingested, inhaled, or otherwise taken into the body or the jurisdiction in which the substance was detected in the body of the accused.

This Court has clearly held that a positive urinalysis which reveals the presence of a controlled substance is sufficient to support a conviction under SDCL 22–42–5. *See State v. Schroeder,* 2004 SD 21, 674 N.W.2d 827. Likewise, by the statute's plain language, simply detecting the substance in the defendant's body is sufficient to sustain a conviction under SDCL 22–42–15. Therefore, the fear that evidence was being destroyed in the home was wholly insufficient justification for the officer's warrantless entry into the home. Assuming for the moment that they were legally on the premises, the officers should have maintained the status quo and obtained a search warrant to enter to house and conduct a urinalysis on the defendants.

[¶ 45.] The majority opinion's concern with the seriousness of the crime of possession of methamphetamine becomes irrelevant in light of the fact that whether the evidence was lying on the floor of the bedroom or ingested into the body of the defendant, it remained accessible to the officers. The State bears a heavy burden to prove an exception to the warrant requirement, particularly when it has engaged in a nighttime intrusion into a home. The State has not met that burden. We should reverse the trial court's decision denying the defendants motion to suppress this illegally obtained evidence.

[¶ 46.] MEIERHENRY, Justice joins this special writing.