[No. 33537-9-II. Division Two. January 17, 2007.]

THE STATE OF WASHINGTON, *Respondent*, v. RICHARD ALLEN
LINK, *Appellant*.

686

*Carol A. Elewski*, for appellant.

*Gerald A. Horne, Prosecuting Attorney*, and *Kathleen Proctor, Deputy*, for respondent.

¶1 QUINN-BRINTNALL, J. — A jury convicted Richard Link of unlawful methamphetamine manufacture (count one) and endangerment with a controlled substance (count two). The trial court denied Link's pretrial motion to suppress evidence found during a warrantless search of Caroline Woolsey's apartment, where he was a social guest.[1] The State acknowledges deficiencies in the record but cross-appeals, asking that we reverse the trial court's determination that Link had standing to object to the search of Woolsey's apartment and affirm the result. We conclude that, as a social guest, Link has standing to challenge the initial warrantless search of Woolsey's house. We also hold that no lawful basis supported the warrantless search. Thus, we reverse and remand for further proceedings consistent with this opinion.

---

[1] Inexplicably, Link did not challenge the search warrant, and it does not appear in the record.

## FACTS

BACKGROUND

¶2 The following facts are undisputed on appeal. Link and Woolsey had been high school sweethearts and had known each other for 15 years. Although the couple had drifted apart over the years, on June 6, 2004, the two were romantically involved. Link had spent the night at Woolsey's house once or twice before.

¶3 On this particular date, Link was at Woolsey's apartment to help her pack and move out of a purportedly abusive relationship.[2] Link kept an extra jacket, hat, and pair of shoes at Woolsey's apartment.[3] He did not live in the apartment, was not on the lease, and did not receive mail there. But he had his own key, and Woolsey had once allowed him to stay in the apartment alone while she did laundry.

¶4 On June 6, about an hour after Link arrived at Woolsey's apartment, Officer Joseph Mettler arrived to investigate whether a methamphetamine laboratory was being operated inside. Mettler knew that young children lived in the apartment. Near the apartment, he smelled a strong odor of acetone, saw a sheet drawn across a window, and heard a fan running inside. Officer Mettler believed, based on his training and experience, that the acetone smell was a sign of methamphetamine manufacturing. Officer Mettler did not have a warrant and did not seek to obtain a warrant to search Woolsey's apartment at that time.

¶5 Officer Mettler knocked on the front door. No one inside responded, but Woolsey's two children ran up behind Mettler. Mettler spoke with the children, who told him that they were four and seven years old, they lived in the apartment, and their mother was inside. The oldest child then opened the door, left the door open, ran into the

---

[2] Woolsey's previous boyfriend was apparently in jail at the time.

[3] Link also testified that he kept an extra set of clothes at the apartment, but this was disputed by Officer Joseph Mettler, who found no male clothes other than a jacket and shoes.

house, and then yelled "mom." 1 Report of Proceedings (RP) at 22.

¶6 Officer Mettler stepped inside the doorway, near the threshold, and announced that he was there and that he was a police officer. Mettler testified that he was concerned for the children's safety because acetone is highly flammable, but he acknowledged that his primary intention when he entered Woolsey's home was to investigate the possible methamphetamine laboratory.[4] Mettler went further into the apartment,[5] and Woolsey walked into the home's 8- to 10-foot-long hallway, where she met Mettler.

¶7 When Woolsey said, "Rick, the cops are here," Link opened a bedroom door and looked out. Clerk's Papers (CP) at 25. Link had just taken a shower and was only partially dressed. He held a baby bottle with a discolored glass pipe stuck in it, which Officer Mettler immediately recognized as a device for smoking methamphetamine.

■ ■ ¶8 Officer Mettler arrested Link on suspicion of using unlawful drug paraphernalia. While arresting Link, Mettler saw equipment used to manufacture methamphetamine in the bedroom.[6] Mettler did not immediately seize the evidence, but he called for another unit to assist him. While Officer Mettler was waiting, he took Woolsey, Link, and the two children into the kitchen; there he saw additional methamphetamine manufacturing devices. They then evacuated the apartment.

---

[4] Officer Mettler testified that his primary concern was for the children's safety. But the trial court ruled that "Officer Mettler was concerned about the safety of children when he went to the apartment on 6/6/2004, but his primary purpose was investigating a possible meth lab." Clerk's Papers at 26. This finding is a credibility determination that is not subject to review. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). Further, the finding is a verity on appeal because the State did not assign error to it. *State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003).

[5] It is unclear how far Officer Mettler stepped into the apartment.

[6] The items included what appeared to be pseudoephedrine powder, a five-gallon bottle with liquid sludge that exuded the odor of acetone, two one-gallon cans of toluene, and two glass mason jars containing liquid and white residue.

¶9 Officer Mettler advised Link and Woolsey of their *Miranda*[7] rights, after which the two voluntarily made statements acknowledging that methamphetamine was being manufactured in the home. According to Mettler, Woolsey told him that Link came to her apartment with another man and set up a laboratory in her bedroom to manufacture methamphetamine; in exchange, Link would give Woolsey some methamphetamine.

¶10 Officer Mettler then called for the assistance of the Clandestine Lab Team (Lab Team). The Lab Team got a search warrant,[8] executed it, and seized evidence of the methamphetamine lab.

PROCEDURE

¶11 The State charged Link with manufacturing methamphetamine in violation of former RCW 69.50.401(a)(1)(ii) (1998)[9] and endangerment with a controlled substance in violation of former RCW 9A.42.100 (2002). The State further alleged that the manufacturing was done in the presence of a minor, contrary to RCW 9.94A.605.

¶12 Link did not challenge the search warrant; instead, he moved to suppress the evidence found in Woolsey's house under CrR 3.5 and 3.6. The trial court held that Link had standing to challenge the search because he was more than a casual guest in Woolsey's apartment, as evidenced by Link's (1) romantic relationship with Woolsey, (2) having a key to the apartment, and (3) being in a state of semi-undress when he was apprehended.

¶13 But the trial court denied Link's motion to suppress. It concluded that Mettler was "legitimately situated when

---

[7] *Miranda v. Arizona*, 384 U.S. 436, 447, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[8] Link does not challenge the warrant, and it is not part of the appellate record.

[9] The information charges Link with violating former RCW 69.50.401(a)(1)(ii). The State used the 1998 version of the statute in the charging instrument. The parties refer to this provision as the operable statute under which Link was charged and convicted. But the statute was amended and former RCW 69.50.401(2)(b) (2003) replaced former RCW 69.50.401(a)(1)(ii). Former RCW 69.50.401 (2003) was the statute in effect when Link committed the crime.

he observed [Link] apparently committing a crime in plain view." CP at 26. In its oral ruling, the trial court reasoned:

> Officer Mettler didn't actually do anything more than stand inside the door at first. He had knocked on the door, one of the children went into the apartment, he simply was taking an opportunity that was presented to him. The idea that he should ignore the possibility that he could contact the occupants of the apartment once he's standing inside the door is probably unreasonable. And he did call out for the occupants and they did appear. And at least Mr. Link's decision to appear while he was committing a crime is his decision. He voluntarily showed his criminal activity to Officer Mettler right there at the—close to the threshold of the apartment. Officer Mettler certainly shouldn't be required to ignore Mr. Link's criminal activity of holding onto drug paraphernalia.

2 RP at 85.

¶14 A jury found Link guilty as charged. The trial court sentenced Link to 134 months on count one and 51 months on count two, to be served concurrently.

¶15 This appeal requires us to address two issues: (1) whether Link has standing to challenge the search of Woolsey's apartment and (2) whether the trial court erred in finding that Officer Mettler had entered Woolsey's home lawfully when he saw Link holding the methamphetamine pipe and in denying Link's motion to suppress the evidence seized as a result of Officer Mettler's observations.[10]

## ANALYSIS

¶16 Link argues that the trial court erred in denying his motion to suppress because the State failed to prove that Officer Mettler entered Woolsey's home lawfully and, therefore, the plain view doctrine did not apply. The State cross-appeals, arguing that Link does not have standing to challenge the search. We first address the threshold issue of standing.

---

[10] Link also argues that he received ineffective assistance of counsel because his attorney failed to object to a hearsay statement. Because we reverse, we do not address this issue.

STANDING

¶17 The State contends that Link lacks standing to challenge Officer Mettler's warrantless search. It argues that the trial court erred when it determined that Link was more than a casual guest in Woolsey's apartment. We hold that Link has standing as a social guest.

¶18 We review issues of standing de novo. *State v. Magneson*, 107 Wn. App. 221, 224, 26 P.3d 986, *review denied*, 145 Wn.2d 1013 (2001). Standing is a "party's right to make a legal claim or seek judicial enforcement of a duty or right." BLACK'S LAW DICTIONARY 1442 (8th ed. 2004). When a defendant seeks to suppress evidence on privacy grounds and the State contests the defendant's standing, the defendant has the burden to establish that the search violated his *own* privacy rights. *State v. Cardenas*, 146 Wn.2d 400, 404, 47 P.3d 127, 57 P.3d 1156 (2002), *cert. denied*, 538 U.S. 912 (2003); *State v. Jacobs*, 101 Wn. App. 80, 87, 2 P.3d 974 (2000). A claimant who has a legitimate expectation of privacy in the invaded place has standing to claim a privacy violation. *Jacobs*, 101 Wn. App. at 87. A two-part inquiry resolves a question of standing: (1) did the claimant manifest a subjective expectation of privacy in the object of the challenged search and (2) does society recognize the expectation as reasonable? *Jacobs*, 101 Wn. App. at 87.

¶19 An overnight guest has standing to challenge a warrantless search. *Minnesota v. Olson*, 495 U.S. 91, 96-97, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990). But a defendant who merely establishes that he was casually and legitimately on the premises does not satisfy his burden to show a legitimate expectation of privacy. *State v. Boot*, 81 Wn. App. 546, 551, 915 P.2d 592 (1996). The middle ground, where the defendant was more than a casual guest but less than an overnight guest, requires a more fact-specific standing analysis. *See Minnesota v. Carter*, 525 U.S. 83, 91, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998).

¶20 No published Washington case has analyzed whether a defendant who was a social guest but was not an overnight guest has standing to contest the warrantless

search of a home. But the Supreme Court in *Olson* answered this question in the affirmative under a certain set of circumstances. *Carter*, 525 U.S. at 91 (explaining *Olson*, 495 U.S. 91). And, in dicta, our court interpreted the Supreme Court as holding that " ' "almost all social guests" ' have a reasonable expectation of privacy." *Magneson*, 107 Wn. App. at 225 n.6 (quoting *Carter*, 525 U.S. at 109 n.2 (Ginsburg, J., dissenting) (quoting Kennedy, J., concurring)).

¶21 Federal and state courts that analyzed whether a social guest had standing found importance in the following factors: (1) the defendant's relationship with the homeowner or tenant, (2) the context and duration of the visit during which the search took place, (3) the frequency and duration of the defendant's previous visits to the home, and (4) whether the defendant kept personal effects in the home.[11] Relating to the second factor, courts typically have found no standing when the defendant was merely the guest attending a large party or the defendant failed to prove that he was the legal occupant's guest.[12] We adopt

---

[11] For example, the following cases found that a social guest had standing based on facts here summarized: *United States v. Fields*, 113 F.3d 313 (2d Cir.) (one defendant's visit lasted several hours before police interrupted; another defendant had an arrangement with the tenant in which the defendant could invite his own guests), *cert. denied*, 522 U.S. 976 (1997); *Bonner v. Anderson*, 81 F.3d 472 (4th Cir. 1996) (defendant was a frequent visitor who was present to run an errand for the occupant); *United States v. Pollard*, 215 F.3d 643 (6th Cir.) (even though defendant conducted illegal commercial transactions during his stay, he stayed at the home earlier in the week, occasionally spent the night, and kept personal effects in the home), *cert. denied*, 531 U.S. 999 (2000); *State v. Lovig*, 675 N.W.2d 557 (Iowa 2004) (defendant was the occupant's cousin, who sometimes stayed overnight and kept personal effects in the home); *State v. Hess*, 2004 SD 60, 680 N.W.2d 314 (defendant was the boyfriend of the tenant and had previously spent the night on several occasions). *And see generally*, 6 WAYNE R. LaFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 11.3(b), at 150-51 n.94 (4th ed. 2004).

[12] *See, e.g., United States v. Cooper*, 203 F.3d 1279 (11th Cir. 2000) (finding no standing because the defendants were merely present in a hotel room and did not allege that they were guests); *Lewis v. United States*, 594 A.2d 542 (D.C. 1991) (stressing the lack of privacy inherent in the comings and goings of other partygoers), *cert. denied*, 502 U.S. 1115 (1992); *City of Champaign v. Torres*, 214 Ill. 2d 234, 245, 824 N.E.2d 624, 291 Ill. Dec. 768 (2005) (reasoning that defendant was "just there to attend a party"); *State v. Redlich*, 2004 MT 235, 322 Mont. 476, 97 P.3d 1090 (finding no reasonable expectation of privacy for party guest in common area of apartment).

these four factors as relevant, but not exhaustive, guidelines for the ultimate question of whether the defendant manifested a subjective expectation of privacy that society recognizes as reasonable. *Jacobs*, 101 Wn. App. at 87.

¶22 Looking at these four factors, we conclude that Link had a legitimate expectation of privacy in Woolsey's home and thus has standing.

### THE DEFENDANT'S RELATIONSHIP WITH THE HOMEOWNER OR TENANT

¶23 Link and Woolsey had a romantic relationship. This factor indicates that Link would have a reasonable subjective expectation of privacy when he was alone with Woolsey and her children. Society recognizes that a tenant's intimate partner has an expectation of privacy while in his partner's home and that this expectation is reasonable.

### THE CONTEXT AND DURATION OF THE VISIT DURING WHICH THE SEARCH TOOK PLACE

¶24 Link testified that he was helping Woolsey pack and move, while the State theorized that Link was in the apartment to manufacture and use methamphetamine. It is clear, however, that the purpose of Link's visit was not simply to engage in illegal and commercial activities; he took a shower and was partially undressed when Officer Mettler intruded. This is more evidence that Link had a subjective expectation of privacy that society would recognize as reasonable.

### THE FREQUENCY AND DURATION OF THE DEFENDANT'S PREVIOUS VISITS TO THE HOME

¶25 Link spent the night at Woolsey's home once or twice before, he had stayed in Woolsey's apartment alone once, and he had his own key. Link had a greater sense of privacy than would a visitor who was helping Woolsey move and who had not been entrusted with a key to the home.

### Whether the Defendant Kept Personal Effects in the Home

¶26 Link kept an extra hat, jacket, and possibly a pair of shoes in Woolsey's home. These items established Link's frequent and possible overnight guest relationship at the apartment and evidence a subjective expectation of privacy in the apartment.

¶27 In summary, all four factors indicate that Link had a legitimate expectation of privacy in Woolsey's home. Accordingly, we hold that Link has standing as a social guest to challenge Officer Mettler's warrantless search.

### Motion To Suppress

¶28 Link urges us to reverse the trial court's denial of his motion to suppress, arguing that the evidence of methamphetamine manufacturing was the fruit of an unlawful warrantless search. To the extent that the seizure relies on Officer Mettler's warrantless search, we agree.

¶29 The Fourth and Fourteenth Amendments govern nonconsensual entry and search of property. *Cardenas*, 146 Wn.2d at 405. And article I, section 7 of the Washington Constitution provides that " '[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law.' " *Cardenas*, 146 Wn.2d at 405 (alteration in original) (quoting Wash. Const. art. I, § 7). Warrantless searches are per se unreasonable. *State v. Morse*, 156 Wn.2d 1, 7, 123 P.3d 832 (2005); *State v. Ladson*, 138 Wn.2d 343, 349, 979 P.2d 833 (1999). Exceptions to the warrant requirement must be " 'jealously and carefully drawn.' " *Morse*, 156 Wn.2d at 7 (internal quotation marks omitted) (quoting *State v. Reichenbach*, 153 Wn.2d 126, 131, 101 P.3d 80 (2004)). The State bears the burden of proof to show that a warrantless search falls within an exception to the warrant requirement. *Morse*, 156 Wn.2d at 7. Community caretaking, consent, and plain view are among these exceptions. *State v. Thompson*, 151 Wn.2d 793, 802, 92 P.3d 228 (2004); *Ladson*, 138 Wn.2d at 349.

¶30 We review findings of fact related to a motion to suppress for substantial evidence, but unchallenged find-

ings of fact are verities on appeal. *State v. Levy*, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006). We review de novo conclusions of law. *Levy*, 156 Wn.2d at 733. Because Link does not challenge the findings of fact supporting the trial court's conclusions, they are verities. But we review de novo the trial court's conclusions of law.

¶31 We consider four arguments. First, the State argues that the trial court incorrectly held that the community caretaking exception did not apply. The community caretaking exception allows for warrantless searches when police (1) make a routine check on health and safety or (2) respond to an emergency in order to render aid or assistance. *Thompson*, 151 Wn.2d at 802. The community caretaking function must be divorced from a criminal investigation. *State v. Kypreos*, 115 Wn. App. 207, 217, 61 P.3d 352 (2002), *review denied*, 149 Wn.2d 1029 (2003). Broadly stated, a law enforcement officer's job is always to serve and protect the community. But where an officer's primary motivation is to search for evidence or make an arrest, this broader purpose does not create an exception to the search warrant requirement. *See State v. Gocken*, 71 Wn. App. 267, 275-77, 857 P.2d 1074 (1993), *review denied*, 123 Wn.2d 1024 (1994).

¶32 The State does not challenge the trial court's finding that "Officer Mettler was concerned about the safety of children when he went to the apartment on 6/6/2004, but his primary purpose was investigating a possible meth lab." CP at 26. This finding is a verity on appeal. *Levy*, 156 Wn.2d at 733. Because Mettler's primary motivation was to investigate a possible methamphetamine lab and not to immediately render aid, the trial court did not err when it concluded that the community caretaking exception did not apply.

¶33 The State's third argument is that the plain view exception to the warrant requirement justifies the search. But the plain view exception to the warrant requirement only applies when the law enforcement officer is lawfully standing in the place when the officer sees some-

thing that he immediately knew was incriminating evidence. *State v. Kull*, 155 Wn.2d 80, 85, 118 P.3d 307 (2005). The trial court here held that "Officer Mettler was legitimately situated when he observed defendant Link apparently committing a crime in plain view." CP at 26. But the record does not support this conclusion. Woolsey did not consent to Mettler entering her apartment and, although Mettler was investigating a crime that could endanger the children, he was not rendering immediate aid to protect their well-being. The State failed to prove that any other warrant exception applied. Thus, Officer Mettler was not standing in a place where he had a right to be when he saw Link walk into Woolsey's hallway holding drug paraphernalia. The trial court erred when it held that the plain view exception applied.

¶34 The State also urges us to remand to allow it to prove the search was lawful under the independent source doctrine. A search warrant based on an affidavit that contains illegally obtained information may be valid if the affidavit contains facts sufficient to establish probable cause independent of the illegally obtained information. *State v. Maxwell*, 114 Wn.2d 761, 769, 791 P.2d 223 (1990). Here, the Lab Team obtained a warrant based, at least in part, on the information in Officer Mettler's affidavit and then used the warrant to seize methamphetamine lab supplies and equipment. The State concedes that Mettler's affidavit was not before the trial court and therefore is not in the appellate record. Although it may be that the search warrant affidavit contains sufficient untainted information independent of Officer Mettler's account of what he saw inside Woolsey's apartment, we cannot review matters outside the record. *State v. Rienks*, 46 Wn. App. 537, 544-45, 731 P.2d 1116 (1987), *remanded*, 110 Wn.2d 1021 (1988); *and see* RAP 9.2(b). Because we would have to review the affidavit in order to decide whether the independent source

doctrine applies and the affidavit is not part of the record, we cannot affirm on this ground.[13]

¶35 In summary, we find that the trial court properly held that the community caretaking exception did not apply. And we find no other ground to support the trial court's denial of Link's motion to suppress based on the warrantless search. The plain view warrant exception does not apply because Officer Mettler was not lawfully inside Woolsey's apartment when he saw Link holding drug paraphernalia. And we cannot affirm on the basis of consent or the independent source doctrine because the record lacks evidence critical to make such a determination. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

ARMSTRONG and PENOYAR, JJ., concur.

Review denied at 160 Wn.2d 1025 (2007).

---

[13] The State asks that we remand to allow it another opportunity to present evidence for our review, specifically the affidavit in support of the search warrant. But the State has not satisfied the requirements of RAP 9.11.