1997 SD 100

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Jevon WESTERFIELD, Defendant and Appellant.**

No. 19707.

Supreme Court of South Dakota.

Considered on Briefs March 27, 1997.

Decided Aug. 6, 1997.

---

Mark Barnett Attorney General, Timothy Bartlett, Assistant Attorney General, Pierre, for plaintiff and appellee.

Gordon D. Swanson of Hansen & Hubbard, Sturgis, for defendant and appellant.

KONENKAMP, Justice.

[¶ 1.] Jevon Westerfield engaged juveniles and others in a marijuana distribution

scheme in the Black Hills area. In his appeal from convictions for distribution, conspiracy, and possession, we review several issues, including standing to challenge the search of a friend's apartment, purported vouching for witnesses by the prosecutor, and the court's order to disclose defense investigator interviews with State witnesses. We conclude Westerfield had no standing, the State never vouched for its witnesses, and although the court violated the statute in ordering discovery of defense interviews, the State's other evidence was so overwhelming we deem the error not prejudicial and affirm.

### Facts

[¶ 2.] On November 14, 1995, Officer Kevin Klunder of the Spearfish Police Department responded to a complaint of a marijuana odor emanating from an apartment on Ames Street. Upon knocking, Klunder was greeted at the door by Kara Taylor, the tenant. Klunder smelled a strong odor of marijuana coming from inside. He then saw Westerfield walk toward a bedroom in the back of the apartment and, fearing for his own safety, Klunder followed. Westerfield quickly reemerged from the room. Klunder patted him down for weapons and found nothing. Glancing in the room Westerfield had just left, Klunder saw the window curtain, which had been closed before Westerfield had entered, was now open. He entered the room, looked out the window and saw a black shoe box on the ground. He concluded the box probably contained marijuana.

[¶ 3.] As Klunder left the bedroom, Westerfield ran from the apartment. He commanded him to stop and "leave the dope alone," but Westerfield continued to flee. Klunder pursued him unsuccessfully, then returned to seize the shoe box. He opened the lid and found another box inside, as well as a green, leafy substance on the lid of the second box. Deciding not to immediately open the interior lid, he brought the box into the apartment and laid it on the living room floor. He then asked Taylor for permission to search the apartment. She refused.

[¶ 4.] Klunder allowed two other people in the living room to leave. Another police officer arrived, and the two made a protective sweep of the apartment. During their search, they found C.S., a minor, hiding in a bedroom closet. Taylor and C.S. were taken to the police station, at which time Taylor verified the marijuana belonged to Westerfield. Search warrants were obtained for Taylor's apartment and car and Westerfield's apartment. With a warrant, the shoe box was searched, revealing thirty-three individually packaged quarter-ounce baggies of marijuana and also some loose marijuana in the box, totaling 6.91 ounces. Westerfield's word processor was also seized in Taylor's apartment; it contained several incriminating records, including distribution agreements, information sheets, billing and possession logs.[1]

[¶ 5.] Exposed through these events was a marijuana distribution scheme, involving juveniles and others, in the Black Hills area. Many of the witnesses who later testified for the State had been participants with Westerfield, but were granted use immunity or plea agreements in exchange for their cooperation. The State's evidence revealed that in October 1995, Westerfield collected between $900 and $1000 from A.R., S.S., Donovan Derek, and David Johnson. Westerfield then traveled to Denver with J.I., another juvenile participant, where he used the money to purchase a pound of marijuana. On the way home, J.I. and Westerfield smoked a portion of it. When they reached Spearfish, they went to Taylor's apartment, where Westerfield gave A.R. and S.S. marijuana to smoke. The next day, he also provided S.S. and J.I. with ten bags of marijuana for them to sell. Eventually, the pound of marijuana obtained in October was expended. In November, Westerfield collected approximately $850 from Johnson and Taylor for another Denver trip. While there, he bought a pound, divided and packaged individual portions, and put them in the shoe box later recovered during the incident in Taylor's apartment.

[¶ 6.] Westerfield was convicted of five counts of Distribution of Marijuana to a Mi-

1. A copy of some of these documents are reproduced at the end of this opinion.

nor (SDCL 22–42–7), one count of Conspiracy to Distribute More than One Pound of Marijuana (SDCL 22–42–7 and 22–3–8), and one count of Possession of Marijuana Less than One–Half Pound (SDCL 22–42–6). He appeals on multiple assignments of error, three of which merit discussion: (1) Did the trial court abuse its discretion when it denied Westerfield's motion to suppress evidence? (2) Was there error in allowing witnesses to state their plea bargains involved the promise of truthful testimony? (3) Did the trial court abuse its discretion in ordering full reciprocal discovery? [2]

## Analysis and Decision

### [¶ 7.] 1. Standing—Warrantless Entry to Home

[¶ 8.] Westerfield moved to suppress the evidence seized, asserting violations of his state and federal constitutional rights. The trial court denied the motion, a ruling we examine under an abuse of discretion standard. *State v. Anderson*, 1996 SD 59, ¶ 8, 548 N.W.2d 40, 42 (citing *State v. Ramirez*, 535 N.W.2d 847, 848 (S.D.1995); *State v. Smith*, 477 N.W.2d 27, 31 (S.D.1991); *State v. Zachodni*, 466 N.W.2d 624, 630 (S.D.1991)). "The ultimate decision of the trial court on suppression will be affirmed unless the defendant can demonstrate that such discretion has been exercised to an end or purpose not justified by, and clearly against, reason and evidence." *State v. Shearer*, 1996 SD 52, ¶ 12, 548 N.W.2d 792, 795 (quoting *State v. Fountain*, 534 N.W.2d 859, 863 (S.D.1995)). A trial court's factual findings are reviewed under the clearly erroneous standard. *State v. Stetter*, 513 N.W.2d 87, 91 (S.D.1994); *State v. Corder*, 460 N.W.2d 733, 736 (S.D.1990).

[¶ 9.] Westerfield argues Klunder's warrantless entry into the bedroom and his observation of the shoe box Westerfield threw out the window constitute an unconstitutional search under the Fourth Amendment to the United States Constitution and Article VI, Section 11 of the South Dakota Constitution. Warrantless searches may be legitimated only by probable cause and exigent circumstances. *Segura v. United States*, 468 U.S. 796, 812, 104 S.Ct. 3380, 3389, 82 L.Ed.2d 599, 613 (1984); *State v. Johnson*, 509 N.W.2d 681, 685 (S.D.1993) (citation omitted). Yet, the threshold question when considering a search and seizure issue is whether the person asserting a constitutional infringement has a reasonable expectation of privacy in the place searched. *State v. Thomale*, 317 N.W.2d 147, 149 (S.D.1982). As constitutional rights are personal, they can only be maintained by defendants having standing. *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir.1995). If a legitimate expectation exists, then a person challenging a search has standing. *Rawlings*, 448 U.S. at 104, 100 S.Ct. at 2561, 65 L.Ed.2d at 641. To determine whether an expectation is reasonable or legitimate, the defendant must first possess and assert a subjective expectation of privacy. *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210, 215 (1986)(citing *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). Then, the question becomes whether society accepts the expectation as reasonable. *Id.*

[¶ 10.] What expectation of privacy did Westerfield have in Taylor's apartment? While there was testimony he was dating Taylor, the evidence also revealed he lived in another part of town in a different apartment with another girlfriend. He made no evidentiary showing at the suppression hearing that

---

**2.** Westerfield also asserts the trial court abused its discretion in denying his motion for judgment of acquittal on the distribution counts. We find this argument insufficient, and we further note he has waived appeal on this issue as he failed to cite any supporting authority. SDCL 15–26A–60(6); *State v. Satter*, 1996 SD 9, ¶ 20, 543 N.W.2d 249, 253.

Also without merit is Westerfield's assertion the indictment was not sufficient to inform him of the charges. "The general function of the indictment is to apprise the defendant with reasonable certainty of the charge with which he is accused and to allow him to plead his acquittal or conviction as a bar to a subsequent prosecution for the same offense." *State v. Anderson*, 1996 SD 46, ¶ 12, 546 N.W.2d 395, 399. We have reviewed the indictment and find it satisfies this test.

he spent substantial time at Taylor's, for instance, nor did he assert that any of his activities at Taylor's created a reasonable expectation of privacy. As the United States Supreme Court noted in *Rakas v. Illinois*, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by the search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387, 395 (1978). Under our state and federal constitutions, Westerfield had no standing to challenge the legality of the search, as he demonstrated no legitimate expectation of privacy. We affirm on this issue.

### [¶ 11.] 2. Improper Vouching

[¶ 12.] Westerfield argues the State improperly vouched for those witnesses who pursuant to their plea agreements promised to testify truthfully. He highlights instances where the prosecutor discussed the plea ramifications with the witnesses. Yet the State merely questioned these persons regarding their understanding of the plea agreement and the accompanying obligation to speak the truth. To decide whether these statements constituted improper vouching, we turn to the criterion in *State v. Goodroad:*

> Prejudicial error, under *Roberts,* does not result from the use of a witness' plea agreement promise to be truthful:
>
>> The mere statement in a plea agreement that a witness promises to speak "truthfully" does not by itself constitute improper vouching. [*People v.*] *Buschard,* 109 Mich.App. [306] at 316, 311 N.W.2d [759] at 764. This "is the same promise he or she makes when called as a witness at trial." *United States v. Leslie,* 759 F.2d 366, 378 (5th Cir.1985). Similarly, a statement in a plea agreement that perjury charges will be brought if the defendant makes any false statement under oath is law already known by most jurors even without instruction by the court.

Thus, in order to find reversible error for admittance of a plea agreement on grounds of improper vouching there must be additional improper insinuations by the government.

455 N.W.2d 591, 594–95 (S.D.1990)(quoting *State v. Chakouian,* 537 A.2d 409, 412 (R.I.1988)(citing *United States v. Roberts,* 618 F.2d 530, 536 (9th Cir.1980))). Westerfield fails to show any "additional improper insinuations." The record reveals no unlawful threats or promises made by the State, *Jenner v. Leapley,* 521 N.W.2d 422, 427 (S.D. 1994), and no prejudicial error results "simply because the State uses the witness' immunity agreement to be truthful." *Id.* (citing *Goodroad,* 455 N.W.2d at 594). "Rather, prejudice can result from the prosecution placing the prestige of the government behind the witness and implying that the prosecutor knows what the truth is and thereby assures its revelation." *Id.* (citations omitted). These exchanges never approach the improper vouching Westerfield asserts. We affirm on this issue. *State v. McCord,* 505 N.W.2d 388, 394 (S.D.1993).

### [¶ 13.] 3. Reciprocal Discovery

[¶ 14.] Westerfield maintains the court abused its discretion in granting the State's discovery request, forcing him to divulge his investigator's interviews of prosecution witnesses. Defense work product is protected from pretrial disclosure. SDCL 23A–13–14. Although the trial court acknowledged this statute, it nonetheless ordered full reciprocal discovery because the State was required to produce the names and statements of its witnesses. To Westerfield this compelled disclosure violated his state and federal due process rights, as well as his right to effective assistance of counsel. U.S.Const.Amends. 4, 6, 14; S.D.Const. Art. VI. We review discovery orders under an abuse of discretion standard. *State v. Erickson,* 525 N.W.2d 703, 711 (S.D.1994); *State v. Catch the Bear,* 352 N.W.2d 640, 644 (S.D. 1984).

[¶ 15.] We hold the trial court abused its discretion in ordering reciprocal discovery of

defense work product. SDCL 23A–13–14 provides:

> Except as to scientific or medical reports, § 23A–13–12 or 23A–13–13 does not authorize the discovery or inspection of *reports, memoranda, or other internal defense documents* made by the defendant, or his attorneys *or agents in connection with the investigation or defense of the case*, or of *statements made by* the defendant, or by *prosecution* or defense *witnesses*, or by prospective prosecution or defense witnesses, to the defendant, his agents or attorneys.

(Emphasis added). This statute, patterned after Federal Rule of Criminal Procedure 16(b)(2), exempts from discovery the material ordered produced here. Companion statutes describe what materials, in fact, the defense can be required to produce before trial.

SDCL 23A–13–12 allows the State to discover "books, papers, documents, photographs, tangible objects, or copies or portions thereof" in the possession of the defendant, but only after the defendant has requested the same from the State under SDCL 23A–13–3 or –4. Likewise, under SDCL 23A–13–13, after a defendant has requested similar material from the prosecutor, the State may discover results of examinations and scientific tests the defendant "intends to introduce as evidence in chief at the trial or which were prepared by a witness whom the defendant intends to call at the trial when the results or reports relate to his testimony."

[¶ 16.] As SDCL 23A–13–14 is patterned after the federal rule, we take guidance from federal cases, and decisions from other states with similar statutes.[3] Never before have we interpreted SDCL 23A–13–14, only touching

---

**3.** Some jurisdictions have abandoned or modified the federal rule. Vitauts M. Gulbris, Annotation, Right of Prosecution to Discovery of Case–Related Notes, Statements, and Reports—State Cases, 23 A.L.R.4th 799 (1983 & 1996 Supp). *See, e.g., Osborne v. Superior Court, Pinal County*, 157 Ariz. 2, 754 P.2d 331 (App.1988) *and* ArizRevStatAnn, RuleCrimProc 15.2 (West Supp 1996)(requiring defense to provide defenses, witness names and statements) & 15.4(b)(1)(work product not discoverable to the extent it contains opinions, theories, conclusions of attorneys or investigatory staff); *State v. Culkin*, 791 S.W.2d 803 (Mo.Ct.App.1990)(no error to compel disclosure of defense counsel's interview with victim, as not work product constituting "opinions, theories, or conclusions" of the defense or privileged communication between attorney and defendant) *and* MoRevStat, RuleCrimProc 25.05(A)(West 1997)(providing discovery, subject to constitutional limitations, of names and statements of those defense intends to call to testify) & 25.10 (work product not discoverable if it contains opinions, theories, or conclusions of attorneys and staff); *Commonwealth v. Brinkley*, 505 Pa. 442, 480 A.2d 980 (1984)(no error in compelling pretrial defense disclosure of verbatim witness statements) *and* PaStatAnn, RuleCrimProc 305 (West 1997)(allowing discovery of names and addresses of witnesses supporting defense's alibi and insanity theories; banning discovery of work product material to the extent it contains "opinions, theories, or conclusions" of an attorney or staff); *State v. Yates*, 111 Wash.2d 793, 765 P.2d 291 (1988)(no abuse of discretion in permitting disclosure to State of defense investigator's taped interviews with prosecution witness, as it was not work product because it did not contain "opinions, theories or conclusions" of the defense team; however, notes and summaries of investigator were only disclosable if the investigator testified) *and* 1990 WashRevCodeAnn CrR 4.7 (West)(allowing discovery of names, addresses, and statements of witnesses defense intends to call, but excluding work product); WisStatAnn § 971.23(2m)(West 1985 & 1996 Supp)(defense can be ordered to produce lists of witnesses it intends to call and their statements)(effective Jan 1, 1997).

Other state courts hold verbatim witness statements to defense investigators are discoverable before trial. *People v. Lego*, 116 Ill.2d 323, 107 Ill.Dec. 647, 652, 507 N.E.2d 800, 805 (1987); *Hicks v. State*, 544 N.E.2d 500, 504 (Ind.1989)(verbatim witness statements not covered by the work product rule, as they are not mental impressions or theories of counsel and are akin to other potential exhibits, photos, and diagrams, the "discoverability of which is unquestioned even if prepared by or at the direction of counsel"). Still other states only require defense disclosure of particular items. *See, e.g., State v. Whitaker*, 202 Conn. 259, 520 A.2d 1018, 1022 (1987)(requiring defense disclosure of names and addresses of alibi witnesses, but not statements); *State in Interest of J.H.*, 244 N.J.Super. 207, 581 A.2d 1347, 1352 (App.Div.1990)(providing, by court rule, that the defense is only obligated to produce statements of alibis and names of witnesses); *compare Lego, supra, with People v. Boclair*, 129 Ill.2d 458, 136 Ill.Dec. 29, 40, 544 N.E.2d 715, 726 (1989)(noting Illinois SCtRule 413 requires disclosure of witness names and statements the defense intends to call).

on the issue presented here before its adoption. *See State v. Means,* 268 N.W.2d 802 (S.D.1978)(not an abuse of discretion to require delivery of signed or recorded statements of defense witnesses, excluding work product, as defendant has shown no prejudice). The United States Supreme Court interpreted old Federal Rule of Criminal Procedure 16(c), now found in 16(b), in *United States v. Nobles,* 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975).[4] In *Nobles,* the defendant sought to impeach the eyewitness the investigator had interviewed with the investigator's testimony and use of his report. The prosecutor asked to read the report for cross-examination purposes. Defense counsel declined to produce it, so the trial court barred the investigator's testimony. The Supreme Court affirmed, finding neither the Fifth nor Sixth Amendment prevented disclosure of the report during trial. 422 U.S. at 234 & 241, 95 S.Ct. at 2168 & 2171, 45 L.Ed.2d at 151 & 155. Furthermore, the Court, while declining to engage in a full discussion of the scope of the work product doctrine, noted it is no bar to the trial court's ruling, as "in this instance it is clear that the defense waived such right as may have existed to invoke [the work product doctrine's] protections." 422 U.S. at 239, 95 S.Ct. at 2170, 45 L.Ed.2d at 154.

[¶ 17.] The *Nobles* Court recognized, "the work-product doctrine most frequently is asserted as a bar to discovery in civil litigation, [but] its role in assuring the proper functioning of the criminal justice system is even more vital." *Id.* at 238, 95 S.Ct. at 2170, 45 L.Ed.2d at 153. SDCL 23A–13–14 embraces this notion, providing broad protection of defense work product: "reports, memoranda, or other internal defense documents made by the defendant, or his attorneys or agents in connection with the investigation or defense of the case, or of statements made by ... prosecution ... witnesses, or by prospective prosecution ... witnesses, to the defendant, his agents or attorneys." This clearly covers the reports generated by Westerfield's investigator, and as the South Dakota Legislature has adopted the federal formulation of the work product rule, instead of the more limited "theories, opinions, thoughts, or conclusions" configuration favored in some states, we are bound to uphold it.[5]

[¶ 18.] Federal courts have taken a similar view of Rule 16, applying the broader definition of work product. *Matter of Grand Jury Subpoenas,* 959 F.2d 1158, 1166 (2d Cir.1992)(under Rule 16(b)(2), except for scientific or medical reports, documents produced by defense attorneys or agents are not available through pre-trial discovery); *In re Antitrust Grand Jury,* 805 F.2d 155, 163 (6th Cir.1986)("Where only confidential communications are protected by the attorney-client privilege, the work product doctrine protects any document prepared in anticipation of litigation by or for the attorney."); *Appeal of Hughes,* 633 F.2d 282, 285 (3d Cir.1980)(work product is all "material prepared or collected in advance of litigation," including material generated by an attorney's agent); *In re Grand Jury Investigation,* 599 F.2d 1224, 1228 (3d Cir.1979); *United States v. Felt,* 502 F.Supp. 71, 74 (D.D.C.1980)(no reciprocal discovery of defense witness statements until the defense witness testifies on direct examination). *See generally* 2 Lester B. Orfield, *Criminal Procedure under the Federal Rules* § 16.3 (2d Ed 1985). Although "[n]o one doubts criminal defendants like other parties to litigation can be subjected to reasonable

---

4. Additional United States Supreme Court decisions have touched issues peripheral to the discussion of the discovery statutes in *Nobles. See Wardius v. Oregon,* 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973)(striking down a "notice of alibi defense" law because it did not require the State to reciprocate); *Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970)(upholding Florida's "notice of alibi defense" rule as not violative of the right to counsel or due process).

5. The ABA Standards for Criminal Justice delimit a less expansive work product rule: "Disclosure shall not be required ... of legal research or of records, correspondence, reports, or memoranda *to the extent that they contain the opinions, theories, or conclusions* of the defense attorney or members of the defense legal staff [.]" II *American Bar Association Standards for Criminal Justice,* Standard 11–3.2(b)(i) (2d Ed. 1986)(emphasis added).

rules regulating discovery," *Tyson v. Trigg*, 50 F.3d 436, 445 (7th Cir.1995), our Legislature has set the rules for disclosure, and the trial judge should not have ordered discovery in conflict with SDCL 23A–13–14.

[¶ 19.] Now we must ascertain whether Westerfield was prejudiced by the disclosure. Unless he establishes this, the ruling was harmless error. *State v. Schuster*, 502 N.W.2d 565, 570 (S.D.1993). The prosecutor used the investigator's interview transcripts in his examination of four witnesses. Mention of the interview was merely perfunctory in two instances, raising no specter of prejudice; however, the examination of two others warrants closer scrutiny. At the end of her testimony, Heidi Hayne, a friend of Westerfield's who drove with him and others to Denver on one occasion to buy marijuana, equivocated on whether Westerfield ever asked her to lie about their activities. Accordingly, the prosecutor refreshed her memory with the transcript of her interview with the defense investigator. Still she quibbled, saying Westerfield never told her to lie, but only implied it. Hayne was a minor witness in the State's case.

[¶ 20.] Jody Verplanke, Westerfield's girlfriend and roommate, was also called by the State. After hedging on several points regarding Westerfield's drug dealings, the prosecutor sought to impeach her by reading from the defense investigator's transcript. SDCL 19–14–8 (Fed.R.Evid. 607); SDCL 19–14–24 (Fed.R.Evid. 613(a)). Although the interview she gave apparently implicated Westerfield, not once did she agree to its veracity. At every opportunity she either disavowed it as inaccurate, said she lied to the investigator, or claimed to have no recollection of making the statement upon which the prosecutor tried to impeach her. Twice during her testimony the trial judge cautioned the jury to consider the investigator's interview as quoted in the prosecutor's questions only for the limited purpose of deciding Verplanke's credibility, not as proof what she said earlier was true. The defense investigator was never called to contradict Verplanke

and the other witnesses, and his interview transcripts were never admitted into evidence. If we presume the jury followed the court's admonishment, as we must, then the State's use of Verplanke's interview yielded no substantive evidence against Westerfield. At most, Verplanke's testimony only demonstrated she was unwilling to concede anything remotely implicating Westerfield, a man whose child she had given birth to a week earlier.

[¶ 21.] Many other witnesses testified about Westerfield's collection of funds for purchase of marijuana, his trips to Denver, and his packaging and distributing marijuana to minors for sale or consumption, on several occasions. The computer records presented the jury with an opportunity to evaluate, apart from any eyewitness testimony, evidence on the drug distribution scheme Westerfield was directing. Though in some instances we might be compelled to reverse a case in which the court forced disclosure of defense work product, we believe the evidence here was so overwhelming, any unmerited advantage achieved through the use of the investigator's interviews was harmless error.

> The violation of a defendant's constitutional right may constitute harmless error and therefore not require reversal, if this Court can declare beyond a reasonable doubt that the erroneous admission was harmless and did not contribute to the verdict which was obtained. We must inquire as to whether it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict absent the admission of Helmer's statements to Wiest.

*State v. Helmer*, 1996 SD 31, ¶ 37, 545 N.W.2d 471, 477; *Schuster*, 502 N.W.2d at 570; *State v. Michalek*, 407 N.W.2d 815, 819 (S.D.1987). Beyond a reasonable doubt we conclude the outcome of the trial would not have been different, absent use of the interview transcripts. *Helmer*, 1996 SD 31, ¶ 37, 545 N.W.2d at 477.

[¶ 22.] Affirmed.

[¶ 23.] MILLER, C.J., and SABERS, AMUNDSON and GILBERTSON, JJ., concur.

One of the agreements had listed across the top of the paper, " §pades." The body of the agreement, reproduced verbatim, was as follows:

I _____ UNDERSTAND EVERYTHING ABOUT THE BUSINESS. I UNDERSTAND THAT KNOW ONE SHOULD EVER KNOW OF THE INSIDE DOINGS OF §PADES. I SWEAR THAT I WILL NEVER TELL ON ANYBODY IN THE SPADES ORGANIZATION, EVEN AFTER I LEAVE IT ALONE. I ALSO SWEAR THAT I WILL NOT STEAL OR SHORT MONEY IN ANY CASE. ALL THAT I MAKE SHALL BE TURNED OVER TO THE T-SHIRT MAN.

SIGNED BY

_____

§PADES

_____

Another of the agreements, reproduced verbatim, was:

§PADES      §PADES      §PADES

Recently as you know we have a few new details in the group, Red and Dre. You know as well as I know that they really dont know anything about this type of business. We must take all this into concideration and not let them know about the whole opperation. I feel that it is to risky to tell them about everything. Like you know as well as I do Dre's mouth is to loud so we must be very careful on what we say and do around them. We're poping off to good to go wrong so keep it clean.

With the money situation, Red can give me a hundred dollars for his hit that means he will get two hundred back wich well leave us with **TWENTY THREE HUNDRED DOLLARS**. After were finished with this pound we will not just stop, We will go get another as soon as we can!. We will have a mandatory meeting on Monday November 6, at 8pm. Thats when we'll cover everything with Red and Dre. The T-shirts we'll be kept at a different location other than my house, further information about this will be talked about the meeting before Dre and Red come so be at your house at 7:45pm. ONCE AGAIN ITS ON FOR §PADES!.

A final memo was as follows:

SPADES      SPADES      SPADES

ONCE AGAIN ITS ON! On next Wensday or Thursday Spades, we will be once again on top of things. Myself will be going to Denver to pick up some green T-shirts for the click. Money for the pickup shall be no later than wensday at 5pm. The train will be leaving at 10am on Thursday. So all money must be given to the T-shirt man.

*      *      *      *      *      *

T-SHIRT MEMBERS

–We made a total of 2,501 T-shirts in 3days!

–Be more careful on T-shirts

–We only now are limited to 4 shirts members

–Slinkey wanted to buy, so watch your back!

–Still do not know anything about SLIM.C–MAn find out whats up!

–Try to get off T-shirts for 55 or 60

–Large T-shirts 200

–XL T-shirts 1000

–We are going to have to get more than usual next time and get real hyped!

MONEY OWE

RED 100

DRE 100

DJ 450

Vonne 450 [testimony indicated that this was Westerfield's nickname]

TOTAL

1100

*note*

Burn or destroy After reading

