#31143-a-RG
**2026 S.D. 32**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

v.

DAVID J. SHANGREAUX, JR.,                        Defendant and Appellant.

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

THE HONORABLE CHRISTINA L. KLINGER
Judge

BEAU BLOUIN of
South Dakota Office of
    Indigent Legal Services
Sioux Falls, South Dakota                        Attorneys for defendant and
                                                 appellant.

MARTY J. JACKLEY
Attorney General

ERIN E. HANDKE
Assistant Attorney General
Pierre, South Dakota                             Attorneys for plaintiff and
                                                 appellee.

ARGUED
APRIL 21, 2026
OPINION FILED **05/20/26**

#31143

GUSINSKY, Justice

[¶1.]        Following a 911 call from a neighbor, police arrived at David Shangreaux, Jr., and Liv Guerue's apartment in Pierre, South Dakota. Shangreaux was present in the apartment when police arrived. Shortly after Shangreaux spoke with police, officers entered the apartment to detain Shangreaux and discovered E.M. deceased in the bathroom. E.M. had been stabbed several times. Shangreaux was arrested and charged with E.M.'s murder. After a trial, a jury convicted Shangreaux of second-degree murder, and he was sentenced to life in prison. Shangreaux appeals. We affirm.

## Factual and Procedural History

[¶2.]        Shangreaux and his girlfriend, Liv Guerue, lived together in an apartment in Pierre, South Dakota. In November 2023, Guerue invited E.M.—a teenage girl whom Guerue and Shangreaux met while she served the two as a waitress at Perkins—to hang out at their apartment. E.M. agreed. Shangreaux and Guerue picked E.M. up on November 30, 2023, around 5:00 p.m. and brought her back to their apartment.

[¶3.]        Shortly thereafter, E.M.'s two friends, Whitley Woehl and L.B., arrived at the apartment to drink alcohol and play games together in the living room. L.B. testified that Shangreaux was "wasted," and that he became visibly frustrated when E.M. was winning the card game they were playing. During the evening, Guerue became sick and went to the nearby bathroom to vomit. L.B. followed to hold her hair back. Woehl and L.B. testified at trial that while Guerue was throwing up, Shangreaux got angry and pushed L.B. out of the bathroom, blocked the exit of the

-1-

apartment, and threatened the two while waving a knife around. L.B. and Woehl left the apartment once Shangreaux stepped out of the way. Shangreaux and Guerue's neighbor, Christina Mack, testified that she saw L.B. and Woehl leave the apartment between 8:15 and 8:30 p.m. Neither L.B. nor Woehl reported the incident.

[¶4.] Once the two left, Guerue became sick again, and E.M. followed her into the bathroom to hold her hair. Guerue testified at trial that while she was in the bathroom with E.M., Shangreaux entered the bathroom and began arguing with E.M. while Guerue stood between them. Guerue further testified that Shangreaux shoved her toward the bathroom door, after which Guerue fled the apartment with E.M.'s phone and ran to the nearby Taco Johns for help. Video surveillance footage showed Guerue arriving at Taco Johns at 8:59 p.m. Guerue testified that she attempted to call 911 from Taco Johns, but that she saw police arriving at the apartment and abandoned her effort. Guerue received a ride from an employee's father to the Clubhouse Hotel & Suites where she worked.

[¶5.] Two 911 calls were made. At 8:48 p.m., Keenan Running Crane, E.M.'s boyfriend, called 911 and identified himself as E.M.'s brother, requesting a wellness check on E.M. at the apartment. Around 9:03 p.m., Christina Mack called 911 and reported Shangreaux was outside yelling the word "babe" and banging on the passenger window of an SUV. Mack reported Shangreaux appeared very intoxicated, was wearing a baseball glove, and had an object in his hand.

[¶6.] Sergeant Jacob Harlow and Officer Gregory Jones with the Pierre Police Department arrived on scene shortly thereafter. Sergeant Harlow went down

the stairs to Shangreaux and Guerue's apartment while Officer Jones went up the stairs to speak with Mack. Sergeant Harlow knocked on Shangreaux's door, and Shangreaux answered within 10 to 15 seconds. When he answered, Shangreaux was sweating, breathing heavily, and had a knife blade sticking out from his left pants pocket. This entire interaction was captured by Sergeant Harlow's body camera footage.

[¶7.]      Sergeant Harlow asked who was banging on the SUV outside, and Shangreaux replied his "wife" was, referring to Guerue. Sergeant Harlow then asked to speak with her, and Shangreaux agreed to go get her. Shangreaux walked back into the apartment while Sergeant Harlow stood at the door. Shangreaux returned to the door without Guerue and told Sergeant Harlow that everyone was trying to sleep, and that everything was okay. Sergeant Harlow asked Shangreaux his name, and he replied, "Unless, you know, whenever I'm ready to go, I'll tell you my, my name." Sergeant Harlow then asked where he was ready to go, and Shangreaux pointed to the upstairs apartment where Christina Mack resided and indicated the "people up here" were trying to kill him.

[¶8.]      While gesturing, Sergeant Harlow noticed blood on Shangreaux's arm and asked him about it. Again, Shangreaux pointed to the upstairs apartment. Sergeant Harlow then asked Shangreaux to return to get Guerue once more, and Shangreaux walked back into the apartment. Footage from Sergeant Harlow's body camera shows Shangreaux walking back and forth between rooms, eventually ending up in the bedroom with his hands on his head standing silently. After

observing this, Sergeant Harlow called Officer Jones away from Christina Mack's apartment to assist him with Shangreaux.

[¶9.]     Shangreaux returned to the door without Guerue moments later, and Sergeant Harlow detained him. Sergeant Harlow told Officer Jones to "check the bathroom," wherein Jones found E.M. deceased on the bathroom floor. Autopsy results revealed E.M. was stabbed seven times in the back and neck area, and that the only injury to the front side of her body was a small laceration on her cheek.

[¶10.]     After Shangreaux was detained and E.M. was found, Special Agent Trevor Swanson and other agents with the Division of Criminal Investigation (DCI) arrived to assist with crime scene processing and began taking photographs. Several pieces of evidence were recovered at this time. A five-and-a-half-inch Cuisinart utility knife was located on the windowsill in the bathroom directly above E.M.'s body. DCI identified several shoe tread prints on the bathroom floor, several of which Agent Swanson opined were tactical boots consistent with police and first responders. Agent Swanson opined that one other tread pattern was consistent with the shoes Shangreaux was wearing that night. In the hallway outside the bedroom, a three-and-a-half-inch Cuisinart knife was stuck in the wall. Lastly, DCI recovered the black baseball glove and a Cuisinart knife sheath that Sergeant Harlow removed from Shangreaux's pockets when he detained him in the apartment.

[¶11.]     Police were then able to track Guerue's whereabouts to the Clubhouse hotel. When Sergeant Cole Martin arrived at the hotel, Guerue had no visible injuries, no observable blood on her clothing, and her hotel room was tidy.

Shangreaux was transported to the Hughes County Jail on the night of November 30, 2023, where his blood sample was taken four hours after police responded to his apartment. Results showed a blood alcohol level (BAC) of .141, and forensic chemist Cody Geffre testified at trial that Shangreaux's BAC was likely between .191 and .241 at 8:40 p.m. that night.

[¶12.] Sergeant Martin and Detective David Estes interviewed Shangreaux at the jail on December 1 and 2, 2023. During the December 1 interview, Shangreaux first told investigators he did not know what happened the night E.M. died and that he blacked out. Shangreaux asked several questions about whether Guerue was okay and whether she was being charged with a crime. He then stated that he recalled sitting on the floor with E.M. and Guerue that night, looking for Guerue when Sergeant Harlow arrived, and getting blood on his hands while trying to help E.M. off the floor.

[¶13.] Later during questioning, Shangreaux told detectives that "[m]e and Liv both did it." He claimed that E.M. and Guerue confronted each other in the bathroom before Guerue grabbed a knife, stating Guerue "stabbed [E.M.] once or whatever. Then I took that knife away [from] her, and then I pushed [E.M.]. And [E.M.] went down. Hard." Shangreaux told detectives that he threw the knife onto the floor once he took it from Guerue's hand. At this point, Shangreaux denied stabbing E.M. at all. Later during questioning, however, Shangreaux admitted to stabbing E.M. once in the back with the same knife he took away from Guerue.

[¶14.] On December 2, investigators again returned to question Shangreaux. When asked about the knife he had in his pocket when he first answered the door

for police, Shangreaux told investigators that this was the same knife he had taken away from Guerue after she stabbed E.M. Investigators asked if this was the same five-and-a-half-inch knife found on the windowsill in the bathroom, and Shangreaux stated he did not know and only remembered bits of the night. When asked how many times E.M. was stabbed, Shangreaux admitted that Guerue may have stabbed her three times and that Shangreaux stabbed her twice—marking the third change in Shangreaux's story regarding who stabbed E.M. and how many times she was stabbed.

[¶15.]     Forensic evidence revealed five latent prints on the five-and-a-half-inch knife found on the windowsill. Three of the five were deemed to be of value for consideration, and all three were identified as Shangreaux's prints. Both the five-and-a-half-inch knife and the three-inch knife found in the wall were tested for DNA. Both tested positive for the presence of blood, and E.M.'s DNA was a major contributor to the mixture of DNA on both knives. Shangreaux's tank top, pants, soles of his shoes, and the baseball glove found in his bedroom were all tested and identified as stained with E.M.'s DNA.

[¶16.]     Shangreaux was indicted on December 12, 2023, on Count 1, murder in the first degree, Count 2, murder in the second degree, and Count 3, aggravated assault. Shangreaux was deemed incompetent to stand trial in April 2024, but was restored to competency three months later in July 2024.

*Jury Selection*

[¶17.]    During jury selection of the April 2025 trial, each side exercised 20 peremptory strikes.  The State used one peremptory strike to remove Juror 78, P.D., a Native American.  P.D. answered five questions during voir dire:

> **Defense**:  So I'm curious if you've ever read our names or read about cases of ours.  Only because if there's a concern and it's something that you would want us to know or that you may hold against us or in favor of us, we'd like to know that too.  Anyone ever stumble across our names?  Okay.  We'll start right over here.  [P.D.]
>
> **P.D.**: Yep.
>
> **Defense**: Have you read about cases we've had or on the news?
>
> **P.D.**: [Defense counsel].
>
> **Defense**: [Defense counsel]?
>
> **P.D.**: Quite a bit.
>
> **Defense**: Wonderful.  Anything about that that gives you concern in sitting as a potential juror today?
>
> **P.D.**: Nope.
>
> **Defense**: Willing to give his side of things or anything he says more credence than anybody else?
>
> **P.D.**: Nope.

[¶18.]    In response to a later question, P.D. recounted the following:

> **Defense**: [A]nything you think I should know?  Anything you've held close to your chest until now and I just didn't ask the right question?  Yes.
>
> **P.D.**: So for me, I was a victim of a serious crime.
>
> [. . .]
>
> **Defense**: And I won't force you to go into it.

**P.D.**: Oh, you can Google it.

**Defense**: Well, I might do that but . . . [i]s there something about that experience that gives you some pause in participating as a juror in a criminal case?

**P.D.**: No.

**Defense**: Given that life experience of yours, would it be difficult for you to presume my client innocent from the outset?

[. . .]

**P.D.**: Oh, no, I could presume him innocent.

**Defense**: And you will do so if you are chosen as a juror?

**P.D.**: Yes.

[¶19.]    The next question P.D. replied to was when the State asked: "Anybody had a run in with the law, essentially, that you want to talk about?"

**P.D.**: Yep.  So about 20 years ago, I had one of the—sustained for [sic] complaint against the Rapid City Police Department. Just one night walking home, just pulled over, handcuffed, and they started harassing me.

**State**: You said it was about 20 years ago?

**P.D.**: Yep.

**State**: You heard the names of the law enforcement officers that might testify in this case.  Was it any of them?

**P.D.**: It was definitely not any of them.

**State**: It wasn't me or [co-counsel]; right?

**P.D.**: No.

**State**: 20 years ago, I was 10.

**P.D.**: No comment.

> **State**: Anything about that situation that you're going to hold against the State based on what comes out as evidence in this case?
>
> **P.D.**: No.

[¶20.] The State exercised its fourth peremptory strike to strike P.D. The defense noted the strike and submitted a *Batson* challenge. The defense did so immediately following the strike and did not wait until both sides exercised all their strikes: "Your honor, the State's fourth strike is [P.D.], who I believe is a Native American, and so we would submit a [*Batson* challenge] as to the State's fourth strike of [P.D]."

[¶21.] The court noted the objection by responding "[a]ll right," and the State immediately offered its "non-race related reason" for striking P.D., stating:

> [P.D.] said during jury selection that he at least knows of [defense counsel]. And we looked at his history, his criminal history prior to coming here today. He has a criminal history and he talked a little bit about that today as well. That is the State's reasoning for striking that juror.

[¶22.] The defense replied, admitting that P.D. "said that he was mistreated by law enforcement," but disputing that P.D. ever discussed his criminal history. The court replied that it, too, did not recall P.D. discussing a criminal history. In response, the State attempted to clarify: "Judge, what [defense counsel] referred to was what I was referring to. I guess I had just presumed that that related to his criminal history, but that statement is what I was referring to."

[¶23.] The court recalled that P.D. "referred to police officers jumping out as he was walking down the road and simply handcuffing him for no reason. I think he said he was one of the first excessive force [sic]. Is that what it was?"

**State**: I had a hard time understanding that particular statement, Judge.

**Defense**: Right. He did mention that he had made a complaint against law enforcement, three sustained complaints against Rapid City Police Department is what [defense counsel] remembers.

**Court**: And that was based on, I think then he followed it up with that he was handcuffed out of nowhere as he walked down the road. That's the [c]ourt's recollection. I don't recall any criminal history.

**State**: Correct. Not as far as convictions go, but the general statements he made are the reasons the State is striking him. . . . [H]e has a known criminal history when we looked him up. And the statements he made about his criminal history, which would include his statements about unfair treatment by law enforcement, are the State's concerns.

[¶24.] The defense then stated that they were relying on P.D.'s response to the juror questionnaire, where P.D. had indicated he was convicted of a crime other than a traffic violation. In its final address to the court, the State explained that its strike was "because of those concerns as it relates to law enforcement."

[¶25.] The court noted that this answer "was not explored with [P.D.] in the courtroom" and that "[n]obody followed up with him in the room, and now we're striking what appears to be one of two Native Americans when we have a Native American defendant who's entitled to have a jury of his peers." Despite being "certainly concerned," the court allowed the strike to stand and found that "[c]onviction of a crime, the possibility—the interactions with law enforcement is an adequate reason that I'm going to allow at this time." In explaining its decision, the court reasoned:

I'm going to circle back down to the [*Batson*] challenge. I'm not sure that I made my reasoning of the third analysis clear. The

third being that if a race-neutral explanation was tendered, which it was, then a determination whether the opponent of the strike has proven purposeful and raceful [sic] discrimination. In looking at that, consider[ing] the State's offered reason, and we can't just accept any offered reason, the [c]ourt does make a finding that the State's offered reason was not merely a pretext, that they did provide a valid reason. There wasn't a pretext for racial discrimination in making that strike.

*Trial*

[¶26.]     Shangreaux testified in his own defense at trial. He first testified that he remembered everyone playing cards in the living room and an altercation between him and L.B., but that he blacked out once Woehl and L.B. left the apartment. The next thing he remembered was sitting with E.M. on the bathroom floor while Guerue threw up. Shangreaux testified that he and Guerue were arguing, and E.M. was attempting to calm them down. He then recalled lying in the bedroom while E.M. sat next to him before three people entered the room. Shangreaux remembered hearing a woman's voice before blacking out again, and that when he regained consciousness, someone was standing above him and pushing on his shoulders while an individual in a beaked hat did something to his right hand.

[¶27.]     Shangreaux further recalled seeing someone standing in the bathroom with a cut on her cheek. After this, he exited the apartment and began banging on the SUV windows outside the apartment because he believed Guerue was inside the vehicle. He then returned to the bathroom where he saw the person standing at the sink fall face-down onto the bathroom floor. Shangreaux testified that he attempted to help the person up, but that he did not remember answering the door or talking

to Sergeant Harlow. Shangreaux had no memory of having the Cuisinart knife in his pocket.

[¶28.] When confronted with the conflicting stories he presented to investigators, Shangreaux testified that he told investigators both he and Guerue "did it" in an attempt to get investigators to look into Guerue and her potential involvement. Shangreaux denied stabbing E.M. and denied witnessing the stabbing.

### *Closing arguments*

[¶29.] During closing arguments, the State made the following statements:

> We heard the defendant himself say he doesn't think he was involved, Kennan Running Crane was involved. Whether you believe him or not is up to you. We know he probably lied on the stand.

[¶30.] Later in the rebuttal, the State said:

> Self-serving lies on the stand don't create reasonable doubt. We know what happened. We know from the evidence the defendant stabbed [E.M.] seven times, probably some while she was standing, and probably some with that knife while she was laying on the floor because we know that cast off pattern on that toilet. We know the intent with which he did it. We know he intended to cause her death. We know that the result is a guilty verdict on first-degree murder.

[¶31.] The jury found Shangreaux guilty on Count 2, murder in the second degree. The jury acquitted Shangreaux of murder in the first degree and aggravated assault. The circuit court sentenced Shangreaux to life in prison. Shangreaux appeals, raising two issues for our consideration: (1) whether the circuit court clearly erred in sustaining the State's peremptory strike of a Native American member of the jury pool, and (2) whether the State's comments during

closing argument constituted improper vouching and denied Shangreaux his due process right to a fair trial.

**Analysis**

> **1.** ***Whether the circuit court clearly erred in sustaining the State's peremptory strike of a Native American member of the jury pool.***

[¶32.]    Shangreaux first argues the State's use of a peremptory strike on P.D. was "substantially motivated by discriminatory intent" rather than race-neutral justifications.  Despite the State's race-neutral justifications for the strike, Shangreaux alleges that the record and "multiple indicators of pretext . . . [establish] that the peremptory strike was not genuinely race-neutral but was instead substantially motivated by discriminatory intent."  To support this theory, Shangreaux points to the State's "shifting explanations" and "limited and superficial questioning" of P.D. during voir dire.

[¶33.]    "A challenge to the State's use of peremptory challenges is reviewed for clear error, for the finding of intentional discrimination is a factual determination." *State v. Owen*, 2007 S.D. 21, ¶ 11, 729 N.W.2d 356, 362 (citing *State v. Martin*, 2004 S.D. 82, ¶¶ 13, 16, 683 N.W.2d 399, 403, 405).

[¶34.]    The State violates a defendant's right to equal protection when it eliminates potential jurors on the basis of race.  *Batson v. Kentucky*, 476 U.S. 79, 86 (1986).  When challenging the State's use of a peremptory strike under *Batson*:

> First, the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.  Second, once the defendant has made out a prima facie case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes.  Third, [i]f

> a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.

*State v. Guthmiller*, 2014 S.D. 7, ¶ 12, 843 N.W.2d 364, 368 (alterations in original) (quoting *State v. Scott*, 2013 S.D. 31, ¶ 16, 829 N.W.2d 458, 465–66).

[¶35.] The State contends, for the first time on appeal, that the defense failed to make a prima facie showing to satisfy the first step under the *Batson* framework. When attempting to make a prima facie case, "'[t]he defendant must point to more than the bare fact of the removal of certain venirepersons and the absence of an obvious valid reason for the removal' before the prosecution is required to offer a race-neutral reason for the strike." *United States v. Young*, 129 F.4th 459, 466 (8th Cir. 2025) (quoting *United States v. Young-Bey*, 893 F.2d 178, 180 (8th Cir. 1990)). This includes "identify[ing] facts and circumstances that support the inference of discrimination[.]" *Id.* (citation omitted). In *Young*, the Eighth Circuit held the following language to be insufficient to establish a prima facie case: "Our position is that these are three strikes from the [G]overnment that are Native American people, and we're making a *Batson* challenge." *Id.* at 466–67 (alteration in original).

[¶36.] Here, the language used by the defense in an attempt to make a prima facie case is remarkably similar. The defense stated: "the State's fourth strike is [P.D.], who I believe is Native American, and so we would submit a *Batson* challenge as to the State's fourth strike of [P.D.]" The defense did not identify facts nor circumstances that supported an inference of discrimination aside from P.D.'s

race. This language, without more, is insufficient to establish a prima facie case of discrimination under the *Batson* framework.[1]

[¶37.]     Despite the defendant's failure to establish a prima facie case, however, the State failed to raise this argument to the circuit court, and instead immediately offered its race-neutral justifications for the strike. Because this issue was not presented to the circuit court, the State has waived this issue on appeal.[2] *See State v. Stanley*, 2017 S.D. 32, ¶ 26, 896 N.W.2d 669, 678 ("This Court will not address arguments that are raised for the first time on appeal." (citation omitted)).

[¶38.]     In the second step of the *Batson* framework, once the defense has established a prima facie case of discrimination, the State must "explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes." *Guthmiller*, 2014 S.D. 7, ¶ 12, 843 N.W.2d at 368 (citation omitted). "The State's reasons for a peremptory strike [at this stage of the inquiry] need not be

---

1.    It is unclear from the record how many prospective jurors were Native American. But it is undisputed that the challenge was made after the first known Native American was struck instead of waiting until the end of the jury selection process.

2.    In *Young*, the Eighth Circuit addressed a similar issue and noted the defense "did not satisfy its initial burden to show a prima face case of discrimination" under the first step of *Batson*. *Young*, 129 F.4th at 466. The court nevertheless declined to affirm the conviction on these grounds, noting the failure was "arguably moot" because "the district court ruled on the objection after the race-neutral explanation was given[.]" *Id.* at 467. The court used the phrase "arguably" because its explanation rested on the United States Supreme Court's opinion in *Hernandez v. New York*, wherein a plurality of the Court stated "'the preliminary issue of whether the [objecting party] had made a prima facie showing becomes moot' once a race-neutral explanation has been proffered and the district court has ruled on said objection." *Young*, 129 F.4th at 467 n.4 (quoting *Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality opinion)).

'persuasive or even plausible.'" *State v. Martin*, 2004 S.D. 82, ¶ 14, 683 N.W.2d 399, 403 (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995)). Rather, "the issue is the facial validity of the prosecutor's explanation," and "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed [race] neutral." *Id.* (citation omitted). Shangreaux admits that the State "ultimately offered two reasons for the peremptory strike that courts have generally recognized as race-neutral" and that the circuit court "appropriately moved onto step three of the analysis."

[¶39.] Once a race-neutral justification has been provided, the third step of the *Batson* framework requires the court to determine whether the defense has proven purposeful racial discrimination. *Scott*, 2013 S.D. 31, ¶ 18, 829 N.W.2d at 466. The court is tasked with deciding "if the reason offered for the strike was 'merely a pretext designed to mask the improper consideration of race to exclude' a juror." *Id.* ¶ 19 (citation omitted). There are no "'magic words' the trial court must use in order to fulfill a *Batson* analysis." *Guthmiller*, 2014 S.D. 7, ¶ 16, 843 N.W.2d at 369 (quoting *State v. Ryan*, 2008 S.D. 94, ¶ 13, 757 N.W.2d 155, 159). "For example, 'a trial court implicitly conducts [the required] analysis when it *accepts or rejects* the State's explanations for use of its peremptory challenges.'" *Id.* (alteration in original) (citation omitted).

[¶40.] Once Shangreaux challenged the State's strike of P.D. under *Batson*, the State immediately provided its justification, stating it was striking P.D. because he knew of defense counsel and he had a criminal history. After a discussion between the court and counsel, the State clarified it was striking P.D. because of his

interactions with law enforcement, including the negative experience he revealed during voir dire and his prior criminal history he revealed on his juror questionnaire.

[¶41.]     The court ultimately accepted the State's reasoning for striking P.D. as race-neutral—P.D.'s criminal history and previous negative interactions with law enforcement. Such justifications have previously been recognized as race-neutral justifications. *See United States v. Allen*, 644 F.3d 748, 753 (8th Cir. 2011) (accepting the State's justification based upon a juror's "expression of past dissatisfaction with law enforcement" as race-neutral despite juror's acknowledgement that she could remain fair and impartial in the case); *United States v. Booker*, 576 F.3d 506, 511 (8th Cir. 2009) (holding "past dissatisfaction with law enforcement officers, which could indicate potential bias against the prosecution, is a legitimate race neutral reason for striking prospective jurors"); *United States v. Crawford*, 413 F.3d 873, 875 (8th Cir. 2005) (same).

[¶42.]     We "give great deference to the [circuit] court's finding that the State exercised a race-neutral strike." *State v. Roach*, 2012 S.D. 91, ¶ 34, 825 N.W.2d 258, 267 (citation omitted). On the record before us, we are not left with a "definite and firm conviction" that a mistake has been made. *Martin*, 2004 S.D. 82, ¶ 16, 683 N.W.2d 399, 405. The circuit court did not clearly err in upholding the State's peremptory strike of P.D.

### 2. Whether the State's comments during closing argument constituted improper vouching and denied Shangreaux his due process right to a fair trial.

[¶43.] Shangreaux additionally argues that several remarks the State made during closing arguments constituted improper "vouching" and rose to the level of prosecutorial misconduct. He claims the State, through these comments, violated Shangreaux's right to a fair trial. The State's at-issue statements provided:

> We heard the defendant himself say he doesn't think he was involved, Keenan Running Crane was involved. Whether you believe him or not is up to you. We know he probably lied on the stand. . . . We know what happened. We know from the evidence the defendant stabbed [E.M.] seven times, probably some while she was standing, and probably some with that knife while she was laying on the floor because we know that cast off pattern on the toilet. We know the intent with which he did it. We know he intended to cause her death. We know that the result is a guilty verdict on first-degree murder.

[¶44.] Prosecutorial misconduct claims are generally reviewed for an abuse of discretion. *State v. Hankins*, 2022 S.D. 67, ¶ 31, 982 N.W.2d 21, 32–33. But "[a] party must generally object at trial in order to provide the circuit court with an opportunity to correct the alleged error" and preserve the issue for appeal. *State v. Hayes*, 2014 S.D. 72, ¶ 24, 855 N.W.2d 668, 675 (citing *State v. Beck*, 2010 S.D. 52, ¶ 10, 785 N.W.2d 288, 292). "[I]f an issue of prosecutorial misconduct is not properly preserved for appeal, this Court will analyze the claim under plain error." *Id.* (citation omitted).

[¶45.] "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of a court." SDCL 23A-44-15 (Rule 52(b)). Not every error constitutes plain error, so "the plain error analysis 'must be

applied cautiously and only in exceptional circumstances.'" *Hayes*, 2014 S.D. 72,

¶ 25, 855 N.W.2d at 675 (citation omitted). "Plain error requires a showing of an

'(1) error, (2) that is plain, (3) affecting substantial rights; and only then may this

Court exercise its discretion to notice the error if (4) it seriously affect[s] the

fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (alteration in

original) (quoting *State v. Buchhold*, 2007 S.D. 15, ¶ 22, 727 N.W.2d 816, 822).

"With plain error analysis, the defendant bears the burden of showing the error was

prejudicial." *Id.* (quoting *Beck*, 2010 S.D. 52, ¶ 10, 785 N.W.2d at 293). Error is

prejudicial when there exists "a reasonable probability, that, but for [the error], the

result of the proceeding would have been different." *State v. Carter*, 2023 S.D. 67,

¶ 26, 1 N.W.3d 674, 686 (alteration in original) (quoting *Owens v. Russell*, 2007 S.D.

3, ¶ 9, 726 N.W.2d 610, 615).

[¶46.]     "Prosecutorial misconduct implies a dishonest act or an attempt to

persuade the jury by use of deception or by reprehensible methods." *Hankins*, 2022

S.D. 67, ¶ 32, 982 N.W.2d at 33 (citation omitted). "This Court will find that

prosecutorial misconduct has occurred if (1) there has been misconduct, and (2) the

misconduct prejudiced the party as to deny the party a fair trial." *Id.* (citation

omitted). "If both prongs for prosecutorial misconduct are satisfied, this Court will

reverse the conviction." *Id.* (citation omitted).

[¶47.]     "[N]o hard and fast rules exist which state with certainty when

prosecutorial misconduct reaches a level of prejudicial error which demands

reversal of the conviction and a new trial; each case must be decided on its own

facts." *Id.* ¶ 33 (alteration in original) (citation omitted). But prosecutorial

misconduct "is prejudicial when it 'so infect[s] the trial with unfairness as to make the resulting convictions a denial of due process.'" *Id.* (alteration in original) (quoting *State v. Smith*, 1999 S.D. 83, ¶ 52, 599 N.W.2d 344, 355). "'A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone,' but, if the prosecutor's conduct affects the fairness of the trial when viewed in context of the entire proceeding, reversal can be warranted." *Id.* (citation omitted).

[¶48.] "[P]rejudice can result from the prosecution placing the prestige of the government behind the witness and implying that the prosecutor knows what the truth is and thereby assures its revelation." *State v. Nelson*, 2022 S.D. 12, ¶ 38, 970 N.W.2d 814, 826 (alteration in original) (quoting *State v. Westerfield*, 1997 S.D. 100, ¶ 12, 567 N.W.2d 863, 867). "If a prosecutor conveys this message explicitly or implicitly, they are improperly vouching." *Id.* "Improper vouching invites the jury to rely on the government's assessment that the witness is testifying truthfully." *State v. Manning*, 2023 S.D. 7, ¶ 38, 985 N.W.2d 743, 755 (citation modified). "It is well established that it is within 'the exclusive province of the jury to determine the credibility of a witness.'" *Id.* (quoting *State v. Snodgrass*, 2020 S.D. 66, ¶ 45, 951 N.W.2d 792, 806). But not all comments relating to the credibility of a witness constitute improper vouching, as "the State is permitted to make fair comments on the credibility of witnesses during final argument." *Id.* ¶ 42, 985 N.W.2d at 756 (quoting *Jenner v. Leapley*, 521 N.W.2d 422, 428 (S.D. 1994)).

[¶49.] Here, Shangreaux takes issue with various statements made by the State, most of which start with the phrase "we know." Shangreaux asserts that, in

using this phrase, the State offered statements "more akin to governmental assurances regarding [Shangreaux's] credibility, intent and guilt, than a fair marshalling of the evidence." To support this claim, Shangreaux cites a Ninth Circuit case where the defense made a similar prosecutorial misconduct claim after the prosecution used "we know" statements during closing arguments. *United States v. Younger*, 398 F.3d 1179, 1191 (9th Cir. 2005). The court in *Younger* recognized that the use of "we know" statements during closing arguments "readily blurs the line between improper vouching and legitimate summary" and stated it does "not condone" the use of such statements. *Id.* But the court concluded the prosecution "used the phrase 'we know' to *marshal evidence actually admitted at trial and reasonable inferences from that evidence*, not to vouch for witness veracity or suggest that evidence not produced would support a witness's statements." *Id.* (emphasis added) (citation omitted). Moreover, "we know" statements could be construed as a reference to the collective audience that witnessed a trial and not as a commentary on a witness's credibility.

[¶50.] Thus, the use of a "we know" statement must be viewed in context. Throughout trial, the State introduced evidence that Shangreaux's story shifted several times between the time he first spoke to officers in his apartment to when he testified at trial. Significant forensic and DNA evidence, including Shangreaux's fingerprints on the knife used to kill E.M. and E.M.'s blood on his clothing, suggested he was present and an active participant in the death of E.M. He admitted to investigators during police questioning that he participated in E.M.'s death, but then later testified that he did not stab E.M. nor witness the stabbing.

During trial, the State repeatedly casted doubt on Shangreaux's credibility by highlighting the inconsistencies in his recollection of events and theory of defense.

[¶51.]     Contrary to Shangreaux's claim, the State's remarks during closing arguments were fairly related to the evidence presented at trial and did not suggest the State "had some superior knowledge or criterion, not available to the jury, to establish the witness was testifying truthfully." *Lodermeier v. Class*, 1996 S.D. 134, ¶ 17, 555 N.W.2d 618, 624.  The State's remarks did not constitute impermissible vouching.  We affirm.

[¶52.]     JENSEN, Chief Justice, and SALTER, DEVANEY, and MYREN, Justices, concur.